**ROCK FOR LIFE—UMBC,**
**et al., Plaintiffs,**

**v.**

**Freeman A. HRABOWSKI,**
**et al., Defendants.**

**Civil No. JFM 08–0811.**

United States District Court,
D. Maryland.

Jan. 26, 2009.

Steven Lee Tiedemann, JPB Enterprises Inc., Columbia, MD, David A. French, Joseph James Martins, Travis Christopher Barham, Alliance Defense Fund, Columbia, TN, Steven H. Aden, Alliance Defense Fund, Washington, DC, for Plaintiffs.

Anne Love Donahue, Sally Lotz Swann, State of Maryland Office of the Attorney General, Baltimore, MD, for Defendants.

### *MEMORANDUM*

J. FREDERICK MOTZ, District Judge.

Plaintiffs Rock for Life–UMBC ("Rock for Life"), Olivia Ricker, and Miguel Mendez have filed suit against the University of Maryland, Baltimore County ("UMBC") and several UMBC officials alleging violations of their First and Fourteenth Amendment rights. Plaintiffs challenge the constitutionality of a number of UMBC's former and current policies. De-

fendants contest Plaintiffs' ability to bring their claims due to issues of standing and mootness. Now pending is Defendants' motion for judgment on the pleadings.[1]

The issues have been fully briefed and no hearing is deemed necessary. Local Rule 105.6 (D.Md. 2008). For the reasons stated below, Defendants' motion is granted in part and denied in part.

## I. Facts

For purposes of this motion, "[t]he factual allegations in Plaintiff[s'] complaint must be accepted as true and those facts must be construed in the light most favorable to the plaintiff[s]." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). Plaintiff Rock for Life is an unincorporated association and registered student organization at UMBC.[2] (Am. Compl. ¶ 6.) Rock for Life's self-declared mission is "to defend the rights of the unborn and to awake consciousness and awareness in the UMBC community about the catastrophic effects of abortion for all persons involved and our moral duty to stop its practice." (*Id.*) Plaintiffs bring suit against various officials of UMBC[3] in both

---

1. There are two other pending motions in this case. First, Plaintiffs have moved to amend their complaint. At a preliminary injunction hearing on August 8, 2008, Defendants notified the Court that the parties had negotiated revisions to several of the UMBC policies challenged in Plaintiffs' original complaint, and that the revised policies would take effect for the 2008–2009 school year. (Pls.' Mem. Supp. Pls.' Mot. for Leave to File First Am. Ver. Compl. ("Pls.' Mem. Supp. Mot. to Amend") at 3.) Plaintiffs' motion for preliminary injunction was then dismissed without prejudice as moot. (*See* Order, Sept. 22, 2008.) Subsequent to this hearing and in light of further discovery, Plaintiffs now seek to amend the complaint to add two more UMBC officials as defendants, to correct the facts as to the size of the signs in Plaintiffs' display, to incorporate UMBC's policy changes, and to limit their claims for relief in response to the policy changes. (*See* Am. Compl.)

   Plaintiffs initially sought injunctive, declaratory, and monetary relief from all the challenged UMBC policies (Compl. 24) and continue to do so for the Sexual Harassment Policy, which was not revised. Plaintiffs have removed from the proposed amended complaint their prayer for injunctive relief from the other challenged UMBC policies. The proposed amended complaint indicates that Plaintiffs still seek declaratory relief as to the previous versions of the revised policies (Am. Compl. 29), but Plaintiffs' moving papers state that they only seek monetary damages for the claims involving these policies. (Pls.' Mem. Supp. Mot. to Amend 4; Pls.' Reply Supp. Pls.' Mot. to Amend 4.)

   I will grant Plaintiffs' motion to amend the complaint as there is no undue delay, bad faith, dilatory motive, or other inappropriate conduct on Plaintiffs' part in seeking to amend. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). The amended complaint does not present new theories or claims for relief, does not prejudice Defendants' preparation of their defense, and is responsive to the developments surrounding the preliminary injunction hearing. This opinion will therefore render judgment on the pleadings in the amended complaint.

   Also pending is Defendants' motion for protective order under Rule 26(c) of the Federal Rules of Civil Procedure. Defendants contest Plaintiffs' standing to challenge UMBC's Policy on Sexual Harassment and they therefore seek to prevent discovery related to the development and enforcement of the policy and any complaints filed under it. (Defs.' Mem. Supp. Mot. for Protective Order 3.) Because I find that Plaintiffs do not have standing to challenge this policy, I will grant Defendants' motion for protective order.

2. The other two plaintiffs, Olivia Ricker and Miguel Mendez, are current students at UMBC, and officers of Rock for Life. (Am. Compl. ¶¶ 7–8.)

3. Defendants are: Freeman A. Hrabowski, UMBC President; Charles J. Fey, Vice President of Student Affairs; Nancy Young, Interim Vice President of Student Affairs; Lee Calizo, Acting Director of Student Life; Joseph Reiger, Executive Director of the Commons; Eric Engler, Acting Director of the

their individual and official capacities.[4] (Am. Compl. ¶¶ 9–16.)

This lawsuit arises out of Rock for Life's decision to set up a poster display on UMBC's campus. The poster display, designed as part of a pro-life advocacy program known as the Genocide Awareness Project ("GAP"), is distributed by an organization called the Center for Bio–Ethical Reform. (*Id.* ¶¶ 58–60.) The GAP is

> a traveling photo-mural exhibit which compares the contemporary genocide of abortion to historically recognized forms of genocide. It visits university campuses around the country to show as many students as possible what abortion actually does to unborn children and get them to think about abortion in a broader historical context.

(*Id.* Ex. P.) The GAP display is made up of twenty-four signs measuring four feet by eight feet in size. (Am. Compl. ¶ 78.)

In March 2007, Rock for Life—with the support of Leif Parsell, a representative of the Leadership Institute, a conservative advocacy organization—began planning to bring the GAP to UMBC. (*Id.* ¶ 64.) Rock for Life met with a UMBC employee in the Office of Student Life to request use of the space "directly in front of the University Center" in order "to maximize the number of students and faculty who would see the display." (*Id.* ¶ 65.) Rock for Life was informed that this space was available, and reserved the space for April 30, 2007.

(*Id.* ¶ 66.) At the same time, Rock for Life was informed that, "due to the nature of the GAP display," Rock for Life would be required to have security at the event. (*Id.* ¶ 67.) Rock for Life was told by the UMBC police department that the "content of the GAP display's signs" necessitated a "uniformed officer rather than a student marshal," (*id.* ¶ 68) and that Rock for Life would be responsible for the $50.00 per hour fees associated with this level of security.[5] (*Id.* ¶ 69.) In response to this news, Rock for Life, through its legal counsel, submitted a letter which stated that UMBC could not constitutionally charge Rock for Life for the cost of security. (Am. Compl. Ex. T.)

Shortly thereafter, Parsell, on behalf of Rock for Life, met with Chris Tkacik, UMBC's University Counsel. At that meeting, Tkacik "expressed concern that students would feel 'emotionally harassed' due to the GAP display and indicated that UMBC had the right to prevent such feelings." (Am. Compl. Ex. N ¶ 13.) Tkacik stated that while UMBC was a public university, it had the authority to move events without notice. (Am. Compl. ¶ 72; *see also id.* Ex. N ¶ 13.) Tkacik also stated that the GAP display should be moved from the space in front of the University Center to the patio of the Commons, which Parsell accepted as a suitable alternative since the patio was also a high-traffic area.[6] (Am. Compl. Ex. N ¶ 14.)

---

Commons; and two defendants added in the amended complaint, Antonio Williams, Chief of Police at UMBC, and Lynne Schaefer, Vice President of Administration and Finance. (Am. Compl. ¶¶ 9–16.)

4. There is one exception: Defendant Charles Fey is sued only in his individual capacity, presumably because he is no longer employed by UMBC. (Am. Compl. ¶ 10.)

5. A student marshal would have cost $15.00 per hour. (Am. Compl. ¶ 69.)

6. Rock for Life alleges that UMBC has allowed other groups to use the area in front of the University Center. (*See* Am. Compl. ¶ 77 (listing permitted events including political events, club solicitations, and "organizations holding up signs for various events and causes on campus").) However, Rock for Life does not indicate whether any of these exhibits were similar in size to the GAP display.

Around this time, UMBC's Associate Director of Student Life, defendant Lee Calizo, announced that Rock for Life did *not* need security at the event. (Am. Compl. ¶ 75.) The UMBC Police Department did not, however, change their security recommendation. (*Id.*) Plaintiffs also allege that Calizo decided to move the GAP display to the patio area of the Commons with the justification that "the original location posed a fire hazard because the large signs might obstruct the exits of the surrounding buildings." (*Id.* ¶ 76.) Rock for Life challenges this rationale, explaining that the signs "were not going to be placed in front of the exits." (*Id.* ¶ 78.)

When Rock for Life began setting up the GAP display on the patio the day of the planned event, April 30, 2007, defendant Eric Engler, Director of the Commons, approached with several uniformed police officers. (*Id.* ¶ 81.) Engler informed Rock for Life that defendant Charles Fey, UMBC's Vice President of Student Affairs, had decided the previous Friday "that the [GAP] display had to be moved yet again to the large vacant field behind the Commons." (*Id.* ¶ 81–82.) According to Rock for Life,

> [t]he part of the field on the north side of the Commons where Rock for Life[ ] was ordered to set up the GAP display was well away from the sidewalks where students occasionally passed by.... Due to the much lower level of foot traffic through this area, the move substantially impaired Rock for Life['s] ability to confront students and faculty with its message....

(*Id.* ¶ 84, 85.) After approximately two hours, Rock for Life was permitted to move its display "closer to the north side

of the Commons so as to be closer to the sidewalks where students occasionally passed, but it was never allowed to move to the patio area of the Commons." (*Id.* ¶ 88.) The day ended without further incident.

In November 2007, Rock for Life began plans for a second GAP display. (*Id.* ¶ 91.) Rock for Life asked UMBC for permission to set up the display on the patio area of the Commons, believing that their first choice site, the aforementioned space in front of the University Center, would be denied to them. (*Id.*) On November 16, 2007, Rock for Life's request was denied by UMBC's University Counsel. (*Id.* ¶ 93.) Rock for Life was informed that any future displays would be permitted to occur *only* on the north side of the Commons. (*Id.*) Because Rock for Life was displeased with this location, they cancelled plans for the second GAP display.[7] (*Id.*)

Plaintiffs' legal challenges focus on UMBC's internal policies as well as their decision-making with respect to facilities use. At the preliminary injunction hearing on August 8, 2008, Defendants informed the Court that UMBC was voluntarily changing its Code of Student Conduct, Code of Student Organization Conduct, and Residential Life policies (collectively, "Codes of Conduct") to remove the terms "intimidation," "emotional harassment," and "emotional safety" which Plaintiffs challenged as unconstitutionally vague and overbroad. (Defs.' Opp'n to Pls.' Mot. for Leave to File First Am. Ver. Compl. 1.) Defendants also informed the Court at that time of changes to UMBC's Policy on Facilities Use, which now specifies the circumstances under which a scheduled event

---

**7.** Rock for Life also highlights in comparison Involvement Fest, an event held by UMBC on September 5, 2007 on the patio area of the Commons, which allegedly involved "substan- tially more space than Rock for Life[ ] required for the GAP display." (Am. Compl. ¶ 90.)

can be moved. (*Id.* 1–2.) Plaintiffs' claims are directed at the former versions of these policies, as well as the unrevised Policy on Sexual Harassment. The policies challenged by Plaintiffs are outlined below.

### A. The Policy on Facilities Use

UMBC's former policy on use of university facilities provided, in relevant part, that:

> The Registrar's and Summer and Winter Programs Offices reserve the right to make changes to academic space assignments at any time.... Nonacademic space is scheduled through Campus Scheduling and Guest Services. Requests must be submitted appropriately through the web-based form and are *scheduled based on room appropriateness and on a first come, first served basis.* Campus Scheduling has *the final authority on scheduling all non-academic requests and has the right to deny requests dependent upon circumstances.*

(Am. Compl. Ex. L at 2 (emphasis added).) The former Policy on Facilities Use allowed for UMBC to "move an event to a different location *without notice*" and provided that UMBC would not be "responsible for any costs incurred by a user resulting from a change in location." (*Id.* at 3 (emphasis added).) The revised Policy on Facilities Use delineates specific circumstances when an event can be moved. (Am. Compl. Ex. M at 3.)

Students could be punished for "unauthorized entry or presence in or on University property," including "failure or refusal to leave University grounds, or a specific portion thereof, or a University facility when requested by an authorized University official." (Am. Compl. ¶ 52.) Punishment for violation of this provision ranged from disciplinary reprimand to suspension or dismissal. (*Id.* ¶ 53.)

### B. The Codes of Conduct

Although these policies have since been revised, Plaintiffs challenge the validity of and seek damages from the former versions of the Code of Student Conduct, the Residential Life Policies, and the Code of Student Organization Conduct. The former Code of Student Conduct stated:

> his rule prohibits, but is not limited to, the following:
>
> . . .
>
> e) intimidation;
>
> f) physical or emotional harassment;
>
> g) sexual harassment or misconduct. . . .

(Am. Compl. Ex. E at 7–8.) The former Residential Life Policies and the former Code of Student Organization Conduct provided that students must not engage in "Behaviors Which Jeopardize the Emotional or Physical Safety of Self or Others," including "intimidation," "physical or emotional harassment," and "sexual harassment or misconduct. . . ." (Am. Compl. Ex. G at 49; Ex. I at 4.) The Codes of Conduct enumerated potential consequences for violations of any of these policies, including reprimand, probation, suspension, dismissal, and termination of the student housing contract. (Am. Compl. Ex. E at 12–13; Ex. G at 49; Ex. I at 7.) The former Codes of Conduct did not define the terms "intimidation," "emotional harassment," or "emotional safety." (*See generally* Am. Compl. Ex. E, G, I.)

### C. The Policy on Sexual Harassment

Plaintiffs challenge the constitutionality of UMBC's Policy on Sexual Harassment, arguing that its definition of sexual harassment is vague and overbroad. (Am. Compl. ¶ 105.) The Policy states:

For the purposes of this Policy, sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:

> 1. Such conduct has the purpose or effect of unreasonably interfering with an individual's academic or work performance, or of creating an intimidating, hostile, or offensive educational or working environment....

Am. Compl. Ex. C at 1. The potential consequences for violation of the Policy on Sexual Harassment are as follows:

> Sanctions against UMBC faculty and staff for violation of this sexual harassment policy may range from formal reprimand to termination. Likewise, sanctions against UMBC students, for violations of this sexual harassment policy, may range from formal reprimand to suspension or expulsion from UMBC educational programs or extra curricula [sic] activities.

(*Id.*)

\*　　\*　　\*

Plaintiffs claim that UMBC's policies have violated their First Amendment rights of freedom of speech and assembly and their Fourteenth Amendment rights of due process and equal protection. In their motion for judgment on the pleadings, Defendants contest Plaintiffs' standing to challenge these policies.

## II. Standard of Review

Under Rule 12(c), a party may move for judgment on the pleadings "[a]fter the pleadings are closed but within such time as not to delay the trial." Fed.R.Civ.P. 12(c). A district court applies the same standard in evaluating a Rule 12(c) motion for judgment on the pleadings as it applies in evaluating a motion to dismiss pursuant to Rule 12(b)(6). *Burbach Broad. Co. v.*

*Elkins Radio Corp.,* 278 F.3d 401, 405 (4th Cir.2002). This standard requires the court to assume that the facts alleged in the complaint are true and to draw all reasonable factual inferences in the non-moving party's favor. *Id.* The purpose of a Rule 12(b)(6) or 12(c) motion is to test the sufficiency of a complaint, not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party v. Martin,* 980 F.2d 943, 952 (4th Cir.1992). "Judgment should be entered when the pleadings, construing the facts in the light most favorable to the non-moving party, fail to state any cognizable claim for relief, and the matter can, therefore, be decided as a matter of law." *O'Ryan v. Dehler Mfg. Co.,* 99 F.Supp.2d 714, 717–718 (E.D.Va. 2000) (*citing Zeran v. America Online, Inc.,* 129 F.3d 327, 329 (4th Cir.1997)).

## III. Standing

▮ "[T]he irreducible constitutional minimum of standing contains three elements": (1) an "injury in fact," meaning an injury that is "concrete and particularized" and "actual or imminent"; (2) a "causal connection between the injury and the conduct complained of," meaning that the injury is "fairly traceable" to the defendant's actions; and (3) a likelihood that the injury "will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks omitted). These prudential limitations are sometimes relaxed "because they are outweighed by competing considerations. Among those weightier considerations within the context of the First Amendment is the danger of chilling free speech." *Burke v. City of Charleston,* 139 F.3d 401, 405 n. 2 (4th Cir.1998).

▮ Normally, a plaintiff may only bring claims on his own behalf and not for

injuries incurred by some third party. However, the standing doctrine allows plaintiffs who bring First Amendment overbreadth claims to challenge a statute, even where it is constitutional as applied to that particular plaintiff, based on "a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) ("[T]he Court has altered its traditional rules of standing to permit—in the First Amendment area—'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.'") (*quoting Dombrowski v. Pfister*, 380 U.S. 479, 486, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965)). "[The overbreadth] doctrine, however, only assists plaintiffs who have suffered some injury from application of the contested provision to begin with." *Gilles v. Torgersen*, 71 F.3d 497, 501 (4th Cir.1995).

Under the relaxed First Amendment standing doctrine, a plaintiff may meet the injury in fact requirement if she can make one of two showings. First, she may satisfy the injury in fact requirement if she has alleged an "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by the statute, and there exists a credible threat of prosecution." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). Second, she may also satisfy the requirement if she can demonstrate that she "is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences." *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 13 (1st Cir.1996).

However, each of these showings "requires a credible threat—as opposed to a hypothetical possibility—that the challenged statute will be enforced to the plaintiff's detriment if she exercises her First Amendment rights." *Ramirez v. Ramos*, 438 F.3d 92, 98 (1st Cir.2006). "A party's subjective fear that she may be prosecuted for engaging in expressive activity will not be held to constitute an injury for standing purposes unless that fear is objectively reasonable." *N.H. Right to Life*, 99 F.3d at 14.

There is "no doubt that the First Amendment rights of speech and association extend to the campuses of state universities." *Widmar v. Vincent*, 454 U.S. 263, 268–69, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). However, as the Court stated in *Widmar*:

A university differs in significant respects from public forums such as streets or parks or even municipal theaters. A university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities. We have not held, for example, that a campus must make all of its facilities equally available to students and nonstudents alike, or that a university must grant free access to all of its grounds or buildings.

454 U.S. at 268 n. 5, 102 S.Ct. 269. Because UMBC has created a forum generally open to student groups (Am. Compl. ¶ 77), it may not seek to enforce content-based exclusion of a particular student group's speech; its regulation of speech must be content-neutral. 454 U.S. at 277, 102 S.Ct. 269.

Here, Plaintiffs allege injuries stemming from several of UMBC's allegedly unconstitutional current and former student policies: (A) the former Policy on Facilities

Use; (B) the former Codes of Conduct; and (C) the Policy on Sexual Harassment. I will address Plaintiffs' standing to challenge each of these policies in turn.

### A. Policy on Facilities Use

■ Plaintiffs challenge the former Policy on Facilities Use on both First and Fourteenth Amendment grounds. They claim a First Amendment violation because the policy created an unreasonable time, place, and manner restriction on their speech by giving University officials unbridled discretion to deny requests for the use of campus facilities and to move Plaintiffs' events and displays without notice or reimbursement. (Am. Compl. ¶ 116.) They claim that the policy also created a chilling effect on their constitutionally protected speech as a result of their fear of discrimination and prosecution under this and other policies. (*Id.* ¶ 102.) Plaintiffs' Fourteenth Amendment Equal Protection claim rests upon the discriminatory application of the policy that they allege occurred when University officials instructed them to move their GAP display to a "nearly deserted area of campus" and when the officials told Plaintiffs that any such events in the future would also be assigned to that area. (*Id.* ¶¶ 2, 102.) Plaintiffs argue that Defendants used the former Policy on Facilities Use "to treat Plaintiffs' student organization differently than similarly situated student organizations" and "to favor speech and assembly of other less controversial and more politically favored groups." (*Id.* ¶ 122.)

■ Defendants argue that Plaintiffs' claims based on the former Policy on Facilities Use are moot since the policy has been changed to address their concerns. (Defs.' Mot. J. on the Pleadings 1.) While this would be true as to Plaintiffs' claims for injunctive relief (which have been removed from the Amended Complaint), it is not true with respect to Plaintiffs' claims for compensatory and nominal damages based on the application of the policy to them. *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 429 n. 4 (4th Cir.2007). Because Plaintiffs allege a personal injury (namely, the relocation of their GAP display first from the University Center to the patio of the Commons, and then again to the north lawn of the Commons, as well as the assignment of any similar future events to the north lawn) that was caused by UMBC's allegedly unconstitutional application of the former Policy on Facilities Use and that is redressable by damages, Plaintiffs are a proper party to bring a suit challenging that policy. Regardless of whether Plaintiffs' claim would ultimately succeed on the merits, they have met the requirements for standing. *See Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("[S]tanding in no way depends upon the merits of the plaintiff's contention that particular conduct is illegal...."). Defendants' motion for judgment on the pleadings is therefore denied as to Plaintiffs' claims for damages with respect to UMBC's Policy on Facilities Use.

### B. Codes of Conduct

■ Since the terms "emotional harassment," "harassment," and "intimidation" have been removed from UMBC's Codes of Conduct, Plaintiffs no longer seek injunctive relief with respect to these policies, nor do they challenge the revised Codes of Conduct as unconstitutionally vague or overbroad. (Pls.' Mem. Supp. Mot. to Amend Compl. 2.) Plaintiffs maintain their claim for damages for alleged violations of their rights to free speech, assembly, and due process of law under the former Codes of Conduct. (Am. Compl. 29.) They allege that the former Codes violated the First Amendment by

allowing viewpoint discrimination and by failing to provide "any objective guidelines by which Plaintiffs could guide their behavior." (*Id.* ¶¶ 115, 114.) Their Fourteenth Amendment due process claim is based on the alleged vagueness and overbreadth of the former Codes of Conduct. (*Id.* ¶ 120.)

Plaintiffs do not allege that they were punished under the Codes of Conduct, but they allege a realistic fear of enforcement of these policies against them. (*Id.* ¶ 102.) This fear is based on the discrimination Plaintiffs allege they were subjected to under the former Policy on Facilities Use, as discussed above, as well as the comment made by Defendant Tkacik to Parsell that he was concerned students would feel "emotionally harassed" because of the GAP display. (*Id.* ¶¶ 102, 73.)

Defendants contest Plaintiffs' ability to show standing based on "one ambiguous factual reference in the Complaint to 'emotional harassment',...." (Defs.' Mem. Supp. Mot. for J. on the Pleadings 8.) Even viewing the facts in the light most favorable to Plaintiffs, as is required at this stage of the litigation, Plaintiffs have still failed to satisfy the injury-in-fact element required to show standing to challenge these policies. In *Morrison v. Board of Education*, the court analyzed the issue of "what 'more' might be required to substantiate an otherwise-subjective allegation of chill, such that a litigant would demonstrate a proper injury-in-fact." 521 F.3d 602, 609 (6th Cir.2008). The court provided the following non-exhaustive list of examples of injury-in-fact: *County Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 482–83 (6th Cir.2002) (the issuance of a temporary restraining order); *Howard Gault Co. v. Tex. Rural Legal Aid, Inc.*, 848 F.2d 544, 558 (5th Cir.1988) (same); *White v. Lee*, 227 F.3d 1214, 1226, 1228 (9th Cir.2000) (an eight-month investigation into the activities and beliefs of the plaintiffs by Department of Housing and Urban Development officials); *Nat'l Commodity and Barter Ass'n v. Archer*, 31 F.3d 1521, 1530 (10th Cir. 1994) ("numerous alleged seizures of membership lists and other property"). The court in *Morrison* concluded that "[e]ven this abbreviated list confirms that for purposes of standing, subjective chill requires some specific action on the part of the defendant in order for the litigant to demonstrate an injury-in-fact." 521 F.3d at 609.

■ In the present case, Plaintiffs have not been subjected to any specific action by Defendants in relation to the Codes of Conduct. Defendant Tkacik's comment does not rise to the level of a concrete threat of prosecution, and the relocation of the GAP display was carried out under the Policy on Facilities Use, not the Codes of Conduct. (*See* Am. Compl. ¶ 102.) Standing to challenge the former Policy on Facilities Use does not "provide [ ] a passport to explore the constitutionality" of other UMBC policies, such as the Codes of Conduct. *Covenant Media of S.C.*, 493 F.3d at 429. "Although there is broad latitude given facial challenges in the First Amendment context, a plaintiff must establish that he has standing to challenge each provision of an ordinance by showing that he was injured by application of those provisions." *Id.* at 430 (internal citations and quotations omitted).

Plaintiffs have failed to show that they suffered an injury-in-fact through the application or threat of application of the former Codes of Conduct beyond subjective chill. They therefore lack standing to challenge the constitutionality of the policies.

*C. Policy on Sexual Harassment*

■ Plaintiffs seek damages as well as injunctive and declaratory relief from

UMBC's allegedly unconstitutional Policy on Sexual Harassment. (Am. Compl. 29.) However, Defendants' motion for judgment on the pleadings is granted as to these claims because Plaintiffs do not have standing to challenge this policy. They do not allege injury as a result of the Policy on Sexual Harassment being applied to them. Nor do they meet the relaxed standing requirements applied in the context of a facial First Amendment challenge. They have therefore failed to show that they suffered any injury in fact that is actual or imminent.

Plaintiffs have not shown that any UMBC official, in relocating the GAP display or in any other interaction with Plaintiffs, applied or threatened to apply UMBC's Policy on Sexual Harassment. Nor have they shown that any other student has been punished or has been threatened with punishment under this policy for activity similar to Plaintiffs'. The only evidence Plaintiffs provide to support their claim of a chilling effect on their speech based on a realistic fear of prosecution under the Policy on Sexual Harassment is a "Weekly Crime Log" listing incidents investigated by UMBC campus police. (Am. Compl. Ex. Y.) The log includes investigations into incidents classified as "harassment" and "acts of intolerance." (*Id.*) The log does not refer to the Policy on Sexual Harassment or discuss punishment for any of the incidents listed.[8] (*Id.*) It sheds no light on the likelihood of enforcement of the Policy on Sexual

Harassment against Plaintiffs or the objective reasonableness of Plaintiffs' fear of punishment under the policy. This evidence therefore provides no support for Plaintiffs' claim.

Because Plaintiffs have "never stated an intention to engage in any activity that could reasonably be construed to fall within the confines of" the Policy on Sexual Harassment, they have "failed to satisfy even the relaxed standing requirements reserved for facial First Amendment challenges." *Ramirez*, 438 F.3d at 99. None of Plaintiffs' activities, including the GAP display and other speech expressing their anti-abortion message, constitute sexual harassment under a straightforward reading of the UMBC policy's prohibition of "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature. . . ." (Am. Compl. Ex. C.) As none of Plaintiffs' activities are even arguably within the policy's reach, Plaintiffs lack standing to challenge the constitutionality of the Policy on Sexual Harassment.[9]

A separate order effecting the rulings made in this opinion is being entered herewith.

## ORDER

For the reasons stated in the accompanying Opinion, it is, this 26th day of January, 2009,

ORDERED:

---

8. These incidents range from racially offensive remarks being written on student message boards to a complaint of offensive emailing to "isolated incidents of harassment by a UMBC student organization's members and affiliates." (Am. Compl. Ex. Y.)

9. I note that these plaintiffs' inability to challenge the constitutionality of the UMBC Policy on Sexual Harassment due to lack of standing is not a decision on the merits of

their claim. Similar university sexual harassment policies have been found unconstitutional in cases brought by appropriate plaintiffs. *See, e.g., DeJohn v. Temple Univ.*, 537 F.3d 301 (3d Cir.2008) (finding Temple University's similar sexual harassment policy unconstitutionally overbroad in a challenge brought by a student who had standing because his class discussions of women in the military were chilled by Temple's policy).

610

1. Defendants' motion for judgment on the pleadings on Plaintiffs' first, second, and fourth causes of action is granted;

2. Defendants' motion for judgment on the pleadings on Plaintiffs' third and fifth causes of action is granted as to UMBC's Codes of Conduct, but denied as to UMBC's Policy on Facilities Use;

3. Plaintiffs' motion to amend the complaint is granted; and

4. Defendants' motion for protective order is granted.