**ROCK FOR LIFE—UMBC,**
**et al., Plaintiffs,**

v.

**Freeman A. HRABOWSKI,**
**et al., Defendants.**

**Civil No. JFM 08–0811.**

United States District Court,
D. Maryland.

July 8, 2009.

Steven Lee Tiedemann, JPB Enterprises Inc., Columbia, MD, David A. French, Joseph James Martins, Travis Christopher Barham, Alliance Defense Fund, Columbia, TN, for Plaintiffs.

Anne Love Donahue, Sally Lotz Swann, State of Maryland Office of the Attorney General, Baltimore, MD, for Defendants.

### OPINION

J. FREDERICK MOTZ, District Judge.

On April 2, 2008, Plaintiffs Rock for Life–UMBC ("Rock for Life"), Olivia Ricker, and Miguel Mendez (collectively "Plaintiffs") filed suit under 42 U.S.C. § 1983 against several University of Maryland, Baltimore County ("UMBC") officials (collectively "Defendants") alleging violations of their First and Fourteenth Amendment rights. (Verified Compl., Dkt. No. 1; Am. Compl. ¶ 100.) Plaintiffs challenged the validity of several UMBC policies. On January 26, 2009, 594 F.Supp.2d 598 (D.Md.2009), I ruled on Defendants' motion for judgment on the pleadings, finding in Defendants' favor on all but Plaintiffs' third and fifth causes of action in Plaintiffs' amended complaint,[1] which seek nominal damages and declaratory relief for the allegedly unconstitutional enactment and application of UMBC's former Policy on Facilities Use. Now before me are the parties' cross-motions for summary judgment as to these claims.

The issues have been fully briefed and no hearing is deemed necessary. Local Rule 105.6 (D.Md.2008). For the reasons stated below, Defendants' motion for summary judgment is granted, and Plaintiffs' cross-motion for summary judgment is denied.

### I.

Plaintiff Rock for Life is an unincorporated registered student association at UMBC.[2] (Am. Compl. 4.) Rock for Life's self-declared mission is "to defend the right of the unborn and to awake consciousness and awareness in the UMBC community about the catastrophic effects of abortion for all persons involved and our moral duty to stop its practice." (Id.) Plaintiffs bring suit against various officials of UMBC[3] in both their individual

---

1. The third and fifth causes of action arise, respectively, from an alleged violation of Plaintiffs' right to free speech and assembly under the First Amendment, and Plaintiffs' Fourteenth Amendment right to equal protection. (Am. Compl. ¶¶ 116, 122.)

2. Plaintiffs Ricker and Mendez are UMBC students and members of Rock for Life who have served as the organization's vice president and secretary, respectively. (Pls.' Mem. Supp. Pls.' Cross–Motion for Summ. J. and Response to Defs.' Mot. for Summ. J. ("Pls.' Cross–Motion") 1–2.)

3. Defendants are: Freeman A. Hrabowski, UMBC President; Charles J. Fey, Vice President of Student Affairs; Nancy Young, Interim Vice President of Student Affairs; Lee Calizo, Acting Director of Student Life; Joseph Reiger, Executive Director of the Commons; Eric Engler, Acting Director of the Commons; Antonio Williams, Chief of Police at UMBC; and Lynne Schaefer, Vice President of Administration and Finance. (Am. Compl. ¶¶ 9–16.)

and official capacities.[4] (Am. Compl. ¶¶ 9–16.)

### A.

This lawsuit arises out of Rock for Life's requests to set up a poster display on UMBC's campus in April 2007, November 2007, and October 2008. The poster display, designed as part of a pro-life advocacy program known as the Genocide Awareness Project ("GAP"), is distributed by an organization called the Center for Bio-Ethical Reform. (*Id.* ¶¶ 58–60.) The GAP is

> a traveling photo-mural exhibit which compares the contemporary genocide of abortion to historically recognized forms of genocide. It visits university campuses around the country to show as many students as possible what abortion actually does to unborn children and get them to think about abortion in a broader historical context.

(*Id.* Ex. P.) The GAP display comes in two versions: a full size version with signs measuring six feet by thirteen feet and a "mini-GAP" display with four foot by eight foot signs. (Pls.' Cross–Motion 9.) While Plaintiffs state in their amended complaint that the GAP display consists of twenty-four of the smaller signs (Am. Compl. ¶ 78), they now clarify that not all twenty-four signs were used in their April 2007 GAP display and estimate that approximately eight of the smaller signs were ordered for that display. (Pls.' Cross–Motion 9.)

Alexander Vernet, Rock for Life's treasurer at the time, played the lead role in organizing the event. (*Id.*) He initially sought to reserve the University Center Plaza for the GAP display, which he thought would maximize the number of students and faculty who would see the display. (*Id.*) Upon learning from the Office of Student Life that the desired location was available, Mr. Vernet reserved it for the morning and afternoon of April 30, 2007.[5] (*Id.*)

Plaintiffs allege that shortly thereafter, Ms. Sheryl Gibbs, office supervisor for the Office of Student Life, became aware of the subject matter of the GAP display and intervened to raise security concerns. (*Id.* 10.) According to Plaintiffs, Mr. Vernet was directed to the UMBC police department, who would determine whether and what level of security would be needed and who informed Mr. Vernet that Rock for Life would have to pay for the security. (*Id.*) Plaintiffs allege that, upon learning that UMBC intended to charge Rock for Life for security, Mr. Vernet presented a letter to the UMBC Police Department stating that Rock for Life believed it should not bear the security costs for the GAP display. (*Id.* 10–11.)

On April 24, 2007, Defendant Calizo, Acting Director of Student Life, e-mailed Mr. Vernet to express logistical and security concerns regarding the April 30 display. (*Id.* Ex. 19.) Defendant Calizo stated that she had not realized the size of the signs until she viewed the GAP website. (*Id.*) She asked Mr. Vernet to confirm the size of the signs and noted that Rock for Life may need to rethink the space for the display because it cannot block pedestrian traffic.[6] (*Id.*) Mr. Vernet responded only

---

**4.** There is one exception: Defendant Charles Fey is sued only in his individual capacity, presumably because he is no longer employed by UMBC. (Am. Compl. ¶ 10.)

**5.** The reservation process begins when a student makes a verbal request to reserve a campus facility to a student staff member of the Office of Student Life, who enters the information into an events request database. (Pls.'

Cross–Motion Ex. 8, Gibbs Dep. 9:6–20, Nov. 21, 2008.) The request is then submitted to the office of scheduling. (*Id.*)

**6.** In her email, Defendant Calizo incorrectly stated that the signs were seven feet by twenty-two feet. (Pls.' Cross–Motion Ex. 19.) However, Mr. Vernet's email in response does not address Defendant Calizo's questions

by stating the shape in which Rock for Life planned to arrange the signs. (*Id.* Ex. 20.)

Defendant Calizo concluded that the GAP display was "too big" to have in front of the University Center Plaza, as it would "block access to and from buildings." (Defs.' Mem. Supp. Mot. for Summ. J. (Revised) ("Defs.' Mem.") Ex. 2, Calizo Dep. 60:9–16, Nov. 21, 2008.) Defendant Calizo met with Mr. Vernet on April 25, 2007 to inform him of her concerns that the display would impede building access and create a fire hazard, and to discuss moving the display to the Commons Terrace, a location which Mr. Vernet was happy with because of the "large amount of traffic and student presence there." (Pls.' Cross–Motion 13; Defs.' Mem. Ex. 8, Vernet Dep. 87:14–15, Jan. 23, 2009.)

However, the issue of security remained unresolved. (Pls.' Cross–Motion 15.) According to Defendants, UMBC's practice is to require student groups who host events on campus to pay for security if required by the university or if the group wants to have security. (Defs.' Mem. 7; Defs.' Mem. Ex. 2, Calizo Dep. 35:20–36:2.) Based on his experience with previous displays on other campuses in which attempts were made to damage or cover up the signs, Mr. Leif Parsell, a Leadership Institute[7] representative who was instrumental in bringing the GAP display to the UMBC campus, believed security would be necessary for the April 30, 2007 GAP display at UMBC. (Defs.' Mem. Ex. 5, Parsell Dep. 53:18–54:23, Feb. 9, 2009.) In a meeting with Chris Tkacik, UMBC's University Counsel, Mr. Parsell[8] presented Mr. Tkacik with a

letter that again stated Rock for Life's position that UMBC's policy of charging student organizations for security was unconstitutional. (Pls.' Cross–Motion 16.) Mr. Parsell understood Mr. Tkacik's "cordial" response during the meeting to mean that the university would waive the cost of security for the GAP display. (Pls.' Cross–Motion Ex. 5, Parsell Dep. 57:16–22.)

Despite the earlier agreement between Mr. Vernet and Defendant Calizo that the Commons Terrace would be an appropriate alternative location for the GAP display, the location was changed again to the North Lawn late in the week prior to April 30. (Pls.' Cross–Motion 17.) Plaintiffs allege that this decision was made by Defendants Fey, Reiger, and Engler. (*Id.*) Defendant Reiger, Executive Director of the Commons, believed that the GAP display was "too large" for the Commons Terrace. (Defs.' Mem. Ex. 6, Reiger Dep. 131:3, Nov. 20, 2008.) He described the Terrace as a congested area with greater demand than anticipated and with steps that are hazardous as they are not in "a known sight line." (*Id.* 130:3–14.) Defendant Reiger states that while some tabling, fundraising, and other student activities have been held on the Terrace, his concerns with allowing the GAP display to be placed there were "the breadth of this display, the amount of square feet and then the obscuring nature of putting up a visual barrier." (*Id.* 131:3–16.) He also expressed concern in response to security issues raised by Plaintiffs that, should an altercation arise, pedestrians would not

---

about the size of the display and does not correct her misunderstanding. (Pls.' Cross–Motion Ex. 20.)

7. Mr. Parsell describes the Leadership Institute as an organization that, among other things, trains college students for single-issue political activism and helps the students run

their events. (Defs.' Mem. Ex. 5, Parsell Dep. 13:5–16, Feb. 9, 2009.)

8. Mr. Parsell attended the meeting in Mr. Vernet's stead because a medical emergency prevented Mr. Vernet from attending. (Pls.' Cross–Motion 15–16.)

have enough space to maneuver around the event. (*Id.* 131:21–132:3.)

Defendant Fey, Vice President of Student Affairs, believed the North Lawn was the best location for the GAP display, both for safety reasons and for visibility. (Defs.' Mem. 9.) The North Lawn is located between the residence halls, which house four thousand students, and the Commons, the Library, and the campus's main academic buildings. (*Id.*) It is also positioned such that anyone traveling from the largest parking structure on campus to the Library or main academic buildings would pass the GAP display on the North Lawn. (*Id.*)

Plaintiffs claim that Mr. Vernet was not aware of the relocation to the North Lawn until the morning of April 30 when he and other members of Rock for Life began unloading signs to set up on the Commons Terrace. (Pls.' Cross–Motion 18.) Plaintiffs allege that Defendant Engler along with "several uniformed UMBC police officers" emerged from the Commons to inform them of the move to the North Lawn, which Plaintiffs describe as "a sparsely traveled field" far from the "hub of student life." (*Id.* 18–19.) Plaintiffs state that while on the North Lawn, there were extended periods of time with no students passing near the display, and there was rarely more than a "handful of students nearby." (*Id.* 19.) According to Plaintiffs, this relocation rendered the event a failure. (*Id.* 20.) Defendants note, however, that Rock for Life has held other events it considered successful on Erickson Field, which is contiguous to the North Lawn. (Defs.' Mem. 10.)

Plaintiffs claim that after approximately two hours, Rock for Life was able to move the GAP display closer to the sidewalks where students occasionally passed, but were prevented by UMBC police from displaying the signs on the other side of the walkway. (Pls.' Cross–Motion 19.) Plain-

tiffs also note that although UMBC police escorted Rock for Life to the North Lawn, the display did not have a constant security presence because Rock for Life did not pay the associated fees. (*Id.* 18.)

### B.

In early November 2007, Rock for Life again attempted to reserve the Commons Terrace for the GAP display. (Pls. Cross–Motion 20.) Rock for Life again delivered to UMBC a letter outlining what Rock for Life believed were UMBC's constitutional obligations toward Rock for Life. (*Id.* 21.) Plaintiffs allege that Mr. Vernet initially attempted to follow the normal reservation procedure, but was later informed that his reservation request had been forwarded to the Vice President of Student Affairs due to the display's controversial nature, and that his request would only be confirmed if he accepted the North Lawn instead of the Commons Terrace. (*Id.*) Plaintiffs point to a chain of emails in which Mr. Tkacik and Defendants Young and Reiger discussed the proposed display. (Pls.' Cross–Motion Ex. 32.) Defendant Reiger described the exhibit as "large billboard sized images of partial abortions" and stated that the group "approached passersby with literature and wanted to engage in dialogue." (*Id.*) He also confirmed that there were no other conflicting events already scheduled and stated, "I only offered the north lawn site and he accepted it." Mr. Tkacik responded, in part:

> O[ffice of] G[eneral] C[ounsel] is comfortable sticking hard to that lawn spot on the Erickson Field side. I recall last time that they pressed up against the walkway. If possible, it would be nice to back off the walkway, allowing for continued traffic pattern in case the display attracted a large number of people.

(*Id.*) When Mr. Vernet was informed on November 16 that his request to use the

Commons Terrace had been denied and that all future similar displays would also be assigned to the North Lawn, Rock for Life decided to cancel the GAP display planned for November 2007 because they believed this area did not allow the display to reach a sufficiently large number of students. (Pls. Cross–Motion 22.)

## C.

Plaintiffs attempted a third time to reserve the Commons Terrace in October 2008. (Pls.' Cross–Motion 22.) Unlike in April and November 2007, their October 2008 reservation request was granted and the GAP display was successfully exhibited on the Commons Terrace. (*Id.* 23.) Plaintiffs allege that the granting of their request was a result of their lawsuit filed in April 2008. (*Id.*) Defendants point alternatively to the deposition testimony of Plaintiff Mendez stating that after the earlier reservation requests were denied, Rock for Life became more "careful" in explaining to the administration the specific details of the event, such as exactly where and when they wanted to set up the display, the estimated crowd, and the size of the display. (Defs.' Mem. 12; Defs.' Mem. Ex. 4, Mendez Dep. 109:3–110:10.)

## D.

The remaining policy at issue in this lawsuit is UMBC's Policy on Facilities Use, which enumerates the rules governing the use of campus facilities and the procedures for the application for such use. (Am. Compl. Ex. L, at I. 2.) At a preliminary injunction hearing held August 8, 2008, UMBC informed the Court of revisions it intended to make to several of the policies challenged by Plaintiffs, including the Policy on Facilities Use. (Defs.' Opp'n to Pls.' Mot. for Leave to File First Am. Ver. Compl. 1.) The former Policy on Facilities Use stated, "Requests ... are scheduled based on room appropriateness and on a first come, first served basis. Campus Scheduling has the final authority on scheduling all non-academic requests and has the right to deny requests dependent upon circumstances."[9] (Am. Compl. Ex. L, at V. 5,) The former policy also stated, "Scheduling may move an event to a different location without notice. UMBC is not responsible for any costs incurred by a user resulting from a change in location." (*Id.* at V. 11.) The revised Policy on Facilities Use, in effect since approximately September 19, 2008, specifies:

Scheduling may move an event (display, facility or table reservation) to a different location upon the occurrence of:

 a. circumstances beyond the control of the University, such as facility infrastructure disruption and/or weather related conditions, or

 b. unanticipated needs of the University for use of the space, and to best utilize space and resources, or

 c. substantial changes in the needs or size of the scheduled event, or

 d. subsequent disruption to concurrent events.

However, if the event (display, facility or table reservation) interferes with traffic flow or access to buildings, the University will make reasonable efforts to control traffic flow and access to buildings before moving an event. If a move be-

---

9. Plaintiffs challenge the constitutionality of the phrases "room appropriateness" and "dependent upon circumstances" in the former Policy on Facilities Use, but because I am herein dismissing their facial challenge as moot and because the provision of the former policy containing these phrases was not applied to Plaintiffs, I will not address this issue. *See Gilles v. Torgersen,* 71 F.3d 497, 501 (4th Cir.1995) ("[The overbreadth] doctrine ... only assists plaintiffs who have suffered some injury from application of the contested provision to begin with.").

comes necessary, the University will move the event to either an agreed-to location or the nearest suitable location. UMBC is not responsible for any costs incurred by a user resulting from a change in location.

(Am. Compl. Ex. M, at V. 11.)

## II.

 A summary judgment motion should be granted when the record establishes that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). A material fact is one that may affect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A party opposing a motion for summary judgment may not rest upon the mere allegations in his pleading, but must set forth specific facts that show there is a genuine issue for trial. *Id.* The non-movant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Runnebaum v. NationsBank of Md., N.A.*, 123 F.3d 156, 164 (4th Cir.1997) (internal quotations omitted). "When cross-motions for summary judgment are submitted to a district court, each motion must be considered individually, and the facts relevant to each must be viewed in the light most favorable to the non-movant." *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir.2003).

## III.

Plaintiffs have moved for summary judgment on their facial challenge to the former Policy on Facilities Use, alleging the policy in effect in April and November 2007 "is facially unconstitutional because it grants unbridled discretion to UMBC officials to discriminate based on the content of the speech and the viewpoint of the speaker." (Pls.' Cross–Motion 24.) They do not challenge UMBC's current Policy on Facilities Use.

 Defendants argue that Plaintiffs' facial challenge to the former Policy on Facilities Use is moot. (Defs.' Mem. in Response to Pls.' Cross Motion for Summ. J. and Reply to Pls.' Response to Defs.' Mot. for Summ. J. ("Defs.' Response") 1.) This Court only has jurisdiction to adjudicate actual cases and controversies, and must dismiss for lack of subject matter jurisdiction a case that becomes moot. U.S. Const. art. III, § 1 et seq.; *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Ariz.*, 520 U.S. 43, 67, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). "A case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (internal quotations omitted).

 UMBC no longer operates under the former Policy on Facilities Use because it voluntarily revised its policy during the course of this litigation. The Supreme Court has stated that "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982). However, the Fourth Circuit has clarified:

Based on our review of the post-*Mesquite* caselaw, however, we are convinced that *Mesquite* is generally limited to the circumstance, and like circumstances, in which a defendant openly

announces its intention to reenact "precisely the same provision" held unconstitutional below. 455 U.S. at 289 and n. 11, 102 S.Ct. 1070. In other words, we remain satisfied that statutory changes that discontinue a challenged practice are "usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed." *Native Village of Noatak v. Blatchford,* 38 F.3d 1505, 1510 (9th Cir.1994) (citing cases). *Valero Terrestrial Corp. v. Paige,* 211 F.3d 112, 116 (4th Cir.2000); *see also Bahnmiller v. Derwinski,* 923 F.2d 1085, 1089 (4th Cir.1991) ("Withdrawal or alteration of administrative policies can moot an attack on those policies."). A district court addressing a similar facial challenge to a university's prior policy on student conduct found the issue to be moot "[b]ecause the University has adopted less restrictive interim policies, and was in fact formulating those policies prior to the incident involving Plaintiff, and because there is no indication that the University has any intention of reverting to its former policies." *Roberts v. Haragan,* 346 F.Supp.2d 853, 858 n. 5 (N.D.Tex.2004). Here, UMBC adopted a policy that addresses Plaintiffs' facial constitutional challenge, namely by revising the policy to no longer allow university administrators to relocate an event for any reason. Additionally, and more importantly in light of the Fourth Circuit's reasoning in *Valero,* there is no evidence in the record that UMBC has any intention to reenact its former Policy on Facilities Use. "Defendants have made the [revised Policy on Facilities Use] as public and as permanent as possible" by formally changing the policy, alerting the Court to the revision, and updating their public website to include the revised policy. *Alpha Iota Omega Christian Fraternity v. Moeser,* No. 1:04CV00765, 2006 WL 1286186, at *4, 2006 U.S. Dist. LEXIS 28065, at *16 (M.D.N.C. May 4, 2006) (unpublished)

(recognizing that the court would be engaging "in purely advisory, theoretical analysis if it were to enter a declaratory judgment on the constitutionality of a nonexistent policy," and refusing to do so, at *4, 2006 U.S. Dist. LEXIS 28065 at *26–27). Accordingly, Plaintiffs' motion for summary judgment on its facial challenge to the constitutionality of UMBC's former Policy on Facilities Use is denied and their claim is dismissed as moot.

## IV.

■ Defendants move for summary judgment on Plaintiffs' as-applied challenge to UMBC's former Policy on Facilities Use. Defendants contend that they are entitled to qualified immunity under 42 U.S.C. § 1983, precluding Plaintiffs' suit against them in their individual capacities. (Defs.' Mot. for Summ. J. 2.) "Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Ridpath v. Bd. of Governors Marshall Univ.,* 447 F.3d 292, 306 (4th Cir.2006) (quoting *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). It is undisputed that the decisions made regarding the location of the GAP display were discretionary.

### A.

■ As an initial matter, "[t]he doctrine of *respondeat superior* generally does not apply to § 1983 suits." *Baker v. Lyles,* 904 F.2d 925, 929 (4th Cir.1990) (internal quotations omitted). A supervisor may only be held liable for the constitutional violations committed by his subordinate if a plaintiff can show that the supervisor tacitly authorized, or was deliberately indifferent to, the subordinate's

actions. *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994). In order to establish supervisory liability under Section 1983, a plaintiff must establish three elements:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Id.* at 799 (internal quotations omitted). To satisfy this test, a plaintiff generally must produce evidence that the conduct complained of is "widespread, or at least has been used on several different occasions," as well as evidence of the supervisor's "continued inaction" in the face of such abuses. *Id.* Defendants Hrabowski, Young, Schaefer, and Williams allege that they are entitled to immunity from liability under Section 1983 because they were not personally involved in deciding on the location of the GAP display in April 2007 or November 2007 and because Plaintiffs have failed to establish supervisory liability. (Defs.' Mem. 20.)

 Plaintiffs' allegations against Defendant Hrabowski, President of UMBC, are based on Defendant Hrabowski's ultimate responsibility for all policies promulgated by UMBC. (Pls.' Cross–Motion 2.) Because Plaintiffs have failed to show personal participation by Defendant Hrabowski or to produce any evidence to support a finding of supervisory liability, Defendant Hrabowski is entitled to qualified immuni-

ty from Plaintiffs' claims against him in his individual capacity.

Defendant Young was appointed Vice President for Student Affairs in July 2007, and therefore had no role in the relocation of the April 2007 GAP display. (Defs.' Response 16.) Plaintiffs allege Defendant Young "oversaw the division, reviewed proposed policy changes, and oversaw supervised [sic] the Director of the Commons (who implements the Facilities Use Policy)." (Pls.' Cross–Motion 2.) Plaintiffs have not provided evidence of a direct connection between Defendant Young and the allegedly unconstitutional actions. The fact of her supervisory role alone is insufficient, and Defendant Young is immune from Plaintiffs' claims against her in her individual capacity.

Defendant Schaefer is the Vice President for Administration and Finance. (Defs.' Response 16.) Defendant Williams is UMBC's Chief of Police.[10] (*Id.* 18.) Plaintiffs have failed to provide any evidence that these defendants had any personal involvement in the GAP display location decisions or any supervisory role over those who were involved in the decisions. Accordingly, Defendants Schaefer and Williams are also entitled to qualified immunity.

**B.**

The remaining defendants who were involved in the GAP display location decisions, Defendants Calizo, Reiger, Fey, and Engler, contend that they are also immune from Plaintiffs' suit against them in their individuals capacities. (Defs.' Response 18.) These defendants are entitled to qualified immunity unless the following two-prong test is satisfied by Plaintiffs' Section 1983 claim: "(1) the allegations

---

**10.** Defendant Williams was not employed by UMBC until June 2007, and therefore could not have had any role in the administrative decisions related to Plaintiffs' April 2007 display. (Pls.' Cross–Motion Ex. 11, Williams Dep. 8:18, 9:9–11, Nov. 19, 2008).

underlying the claim, if true, substantiate the violation of a federal statutory or constitutional right; and (2) this violation was of a clearly established right of which a reasonable person would have known." [11] *Ridpath*, 447 F.3d at 306 (internal quotations and citations omitted). I will address the merits of Plaintiffs' First and Fourteenth Amendment claims in turn, determining whether the facts, when viewed in the light most favorable to Plaintiffs, show that the Defendants' conduct violated a constitutional right, and, if so, whether the right was clearly established.

(1)

In evaluating Plaintiffs' First Amendment claim,[12] I must first determine whether Plaintiffs have engaged in protected speech.[13] *Goulart v. Meadows*, 345 F.3d 239, 246 (4th Cir.2003) (*citing Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)). It is undisputed that the GAP display constituted protected speech under the First Amendment. Next, I must "identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Cornelius*, 473 U.S. at 797, 105 S.Ct. 3439. Finally, I "must assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Id.*

(a)

There are three different types of forums in First Amendment cases: traditional public forums, non-public forums, and limited public forums. *ACLU v. Mote*, 423 F.3d 438, 443 (4th Cir.2005). In a traditional public forum, such as a public street, sidewalk, or park, the government must accommodate all speakers and can only restrict the time, place, or manner of speech "if the restriction is content-neutral, is narrowly drawn to serve a significant state interest, and leaves open ample channels of communication of the information." *Id.* (citations omitted). Any content-based restriction on speech in a traditional public forum is subject to strict scrutiny and may only be enforced if the regulation is "necessary to serve a compelling state interest and ... is narrowly drawn to achieve that end." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

A non-public forum, by contrast, is one that has not traditionally been open to the public, and in which the government may impose restrictions on speech, even content-based restrictions, if the restrictions are viewpoint neutral and reasonable "in light of the purpose of the forum and all the surrounding circumstances." *Cornelius*, 473 U.S. at 809, 105 S.Ct. 3439.

11. The Supreme Court recently reversed its prior holding in *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), that the first of these two prongs must be addressed as a threshold question before reaching the second prong. *Pearson v. Callahan*, —— U.S. ——, 129 S.Ct. 808, 813, 172 L.Ed.2d 565 (2009). Although the procedure is no longer regarded as inflexible, the Court acknowledged that it is often still appropriate to address the prongs in the order previously mandated by *Saucier*. *Id.* at 818. Such is the case here. Because I find no violation of a federal statutory or constitutional right, it fol-

lows *a fortiori* that Defendants are entitled to qualified immunity.

12. The First Amendment is binding on state and local governments through the Fourteenth Amendment. *Edwards v. City of Goldsboro*, 178 F.3d 231, 245 n. 10 (4th Cir.1999).

13. "With respect to persons entitled to be there, our cases leave no doubt that the First Amendment rights of speech and association extend to the campuses of state universities." *Widmar v. Vincent*, 454 U.S. 263, 268–69, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981).

"The third type of forum, a limited or designated public forum, is one that is not traditionally public, but the government has purposefully opened to the public, or some segment of the public, for expressive activity." *Mote*, 423 F.3d at 443. The *Mote* court discussed the two standards that apply to limited public forums: internal and external. *Id.* An external standard, which "applies if the person excluded is not a member of the group that the forum was made generally available to," utilizes the same criteria as are used in the non-public forum analysis. *Id.* "An internal standard applies and the restriction is subject to strict scrutiny 'if the government excludes a speaker who falls within the class to which a designated [limited] public forum is made generally available....'" *Id.* (*quoting Warren v. Fairfax County*, 196 F.3d 186, 193 (4th Cir.1999)) (alterations in original). In other words, for the class for which the government has purposefully opened the forum for expressive activity, the limited public forum is treated as a traditional public forum. *Warren*, 196 F.3d at 193. "So, for instance, a University may not exclude certain student speakers from meeting space or university funding otherwise available on a generalized basis to students and student groups." *Id.* at 193–94.

While the Supreme Court has recognized that "[a] university differs in significant respects from public forums such as streets or parks or even municipal theaters," *Widmar v. Vincent*, 454 U.S. 263, 267 n. 5, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), the Court also noted that "the campus of a public university, at least for its students, possesses many of the characteristics of a public forum." *Id.* I find, given the facts of this case, that the outdoor areas of the UMBC campus are limited public fora. This is consistent with the Fourth Circuit's finding in *Mote* that the University of Maryland's College Park campus is a limited public forum. 423 F.3d at 444; *see also Gilles v. Garland*, 281 Fed.Appx. 501, 511 (6th Cir.2008) (following the "great weight of authority" in finding that the open areas on a public university campus are limited public fora). In *Mote*, the court stated that "the campus is not akin to a public street, park, or theater, but instead is an institute of higher learning that is devoted to its mission of public education." 423 F.3d at 444. UMBC, a constituent institution within the University System of Maryland, shares this mission. (Defs.' Mem. 3; Am. Compl. Ex. L, at III.) [14]

### (b)

Because Plaintiffs in the present case are a registered student association of UMBC and two of its student members, the limited public forum internal standard applies. Under this standard, UMBC cannot exclude a student or student group speaker from the open areas of campus "unless the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Warren*, 196 F.3d at 197 (internal quotations and citations omitted). Content-neutral regulation of speech in these areas of campus by UMBC is "limit-

---

14. UMBC's Policy on Facilities Use states:

UMBC gives usage priority to recognized University organizations, groups, departments, and faculty, staff or student activities. Beyond this, UMBC recognizes its role as a public institution in the state and the local community, and can make appropriate facilities available for events sponsored by other groups so long as those events do not conflict with institutional priorities or adversely impact the University's resources.

(Am. Compl. Ex. L, at III.) This statement is consistent with the characterization of UMBC's open spaces like the Commons Terrace and North Lawn as limited public fora.

ed to 'reasonable restrictions on the time, place, or manner ... provided the restrictions ... are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.' " *Id.* (quoting *Ward v. Rock Against Racism* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). Content-based regulations must be narrowly tailored to accomplish a compelling government interest. *Perry,* 460 U.S. at 45, 103 S.Ct. 948. Which test applies depends upon whether UMBC's actions under the former Facilities Use Policy were content-based or content-neutral.

> The principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.... A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.

*Ward,* 491 U.S. at 791, 109 S.Ct. 2746.

The parties dispute whether Defendants' actions under the policy were content neutral. Defendants have presented several content-neutral reasons for the relocation of the April 2007 GAP display to the North Lawn, most of which are based on the size and format of the display. Defendants allege that they believed the large display was ill-fit for the oddly shaped Commons Terrace and that the large billboards of the display would block visibility, obscure elevation changes, and interfere with ingress and egress in this crowded location. (Defs.' Mem. 8.) Defendants also state that because of security concerns raised by Mr. Parsell based on his past experience presenting the display on other campuses, they believed the Terrace was an inappropriate location as there would not be room for students to move away from any altercation that may arise in response to the display. (*Id.* 7–8.)

Plaintiffs challenge the validity of Defendants' content-neutral reasons. They claim that Defendants incorrectly assumed, based on Defendant Calizo's visit to the GAP website, that the signs to be used in the April 2007 GAP display were larger than the signs Plaintiffs actually planned to use. (Pls.' Cross–Motion 38.) However, as noted by Defendants, Defendant Calizo raised her concern about the size of the signs in an email exchange with Mr. Vernet, and Mr. Vernet did not refute Defendant Calizo's misunderstanding. (Defs.' Mem. 6.)

Plaintiffs also claim that the size concerns raised by Defendant Calizo could not have been the true motivation for moving the display from the Commons Terrace to the North Lawn [15] because Defendant Calizo expressed approval of the Commons Terrace location for the display while she was under the impression the large signs would be used. (Pls.' Cross–Motion 13.) This characterization somewhat misconstrues Defendant Calizo's deposition testimony. Defendant Calizo stated that she viewed the Commons Terrace as a more suitable location than the University Center Plaza, Plaintiffs' initial request, because the Commons Terrace "is a reservable area, other events happen there." (Pls.' Cross–Motion Ex. 6, Calizo Dep. 60:3–4.) She also stated, "the display was too big, it would block access to and from buildings over in the [University Center Plaza] and we needed to make sure we didn't do the same over here [at the Commons Terrace]." (*Id.* 60:13–16.) This testimony indicates that Defendant Calizo be-

---

**15.** I note that Defendant Calizo was not actually involved in the decision to relocate the GAP display from the Commons Terrace to the North Lawn. (Pls.' Cross–Motion Ex. 6, Calizo Dep. 71:12–15.)

lieved the Commons Terrace was a more appropriate location than the University Center Plaza for a student event reservation, but that concerns based on the size of the GAP display still needed to be addressed. Defendant Calizo similarly stated in her April 24, 2007 email to Alex Vernet, "Depending on how many [signs] you plan to have, we may need to rethink the space as it can't block the pedestrian access way. . . . There are still many questions that we need to resolve to make this happen." (Pls.' Cross–Motion Ex. 19.) Furthermore, Defendant Calizo, upon visiting the GAP website, would have become aware of the content of the display at the same time she learned about its size. Therefore, that Defendant Calizo still considered the Commons Terrace a viable option at that point indicates that her opinion was not altered by the content of the display.

Plaintiffs additionally challenge the validity of Defendants' stated reasons related to visibility, blocking of ingress and egress, and obscuring changes in elevation. Plaintiffs claim that these and other size-related concerns are unpersuasive because UMBC has allowed numerous other events that would implicate the same concerns to be held on the Commons Terrace. (Pls.' Cross–Motion 39.) The various events have featured anticipated crowds of up to two thousand and have required equipment including tables, chairs, sound systems, lighting, generators, cars, boats, dunk tanks, and teeter-totters. (Id.) Defendants distinguish the GAP display from these other events based on the size and format of the GAP signs. None of the events cited by Plaintiffs involved signs that were equal in size to either the full-size GAP display or the mini-GAP display. (Defs.' Response Ex. 1, ¶ 3.) The equipment used in the events cited by Plaintiffs

did not create the same form of visual barrier as the large billboards Defendants anticipated would be used in the GAP display. (Defs.' Response 15.) Though a Hummer vehicle was used in one event, it was not parked on the Terrace. (Id.) Similarly, several of the events cited by Plaintiffs as highly attended did not take place on the Commons Terrace, but the Terrace was reserved to maintain an open space outside the Commons during the events. (Id. 14–15.) Plaintiffs now explain that "as each GAP sign stands on its own, the entire display is modular, meaning that the size of the overall display and its footprint can be adjusted to accommodate the available space." (Pls.' Cross–Motion 9.) However, Plaintiffs have provided no evidence that this information was conveyed to Defendants prior to the April 2007 display or that any effort was made to correct Defendants' misunderstanding of the actual size of the display.

Plaintiffs point to Mr. Tkacik's reference to the display as a "controversial exhibit" as evidence that Defendants' actions were content-based. (Pls.' Cross–Motion 39.) Plaintiffs claim that the decision to move the display to the North Lawn as a response to security concerns was based on the controversial content of the display and that Defendants should have installed uniformed police officers while the display was exhibited at the Terrace, rather than succumbing to a "heckler's veto." *See Startzell v. City of Philadelphia*, 533 F.3d 183, 200 (3d Cir.2008) ("A heckler's veto is an impermissible content-based restriction on speech where the speech is prohibited due to an anticipated disorderly or violent reaction of the audience."). However, reference to the exhibit as controversial arose from Plaintiffs' letter alerting Defendants to the controversial nature of the display and the need for security.[16] Defendants

---

**16.** For example, the April 19, 2007 letter from Rock for Life to UMBC states that "because

[the Center for Bio–Ethical Reform, one of Rock for Life's 'supporting organizations']

should not be faulted for taking seriously the concerns raised by Plaintiffs. Furthermore, Plaintiffs were provided the opportunity to have security at their event if, in accordance with UMBC's policy for all student events, Plaintiffs paid for the security.

▮ I find that Defendants' actions were taken "without reference to the content of the regulated speech." *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). Because the regulation of Plaintiffs' speech was content-neutral, it is constitutional if it is "narrowly tailored to serve a significant governmental interest, and ... leave[s] open ample alternative channels for communication of the information." *Id.*

The interests expressed by Defendants include concerns regarding safety and traffic flow based on the size and dimensions of the GAP display. (Defs.' Mem. 8.) Defendants state that they were also alerted to security concerns by Mr. Parsell based on responses to prior GAP displays at other campuses. (*Id.* 7.) Defendants have explained that the area in front of the Commons Terrace is highly trafficked and have stated the need for clear pathways and unobstructed visibility.

▮ Safety and security are legitimate interests of a university. *See Healy v. James*, 408 U.S. 169, 184, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972) ("[A] college has a legitimate interest in preventing disruption on the campus."); *Heffron v. Int'l Soc. for Krishna Consciousness*, 452 U.S. 640, 650–51, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) ("[A] State's interest in protection the safety and convenience of persons using a public forum is a valid governmental objective. Furthermore, consideration of a fo-

rum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved.") (internal quotations and citations omitted); *Roberts v. Haragan*, 346 F.Supp.2d at 864 (finding that a University's request that plaintiff change the location of his speech by approximately twenty feet due to vehicular and safety concerns near a major campus entrance was a legitimate, viewpoint-neutral location consideration that was narrowly tailored to meet a significant University interest). Concern about the display's large posters on a crowded and oddly shaped Commons Terrace presents significant interests of the university.

▮ Plaintiffs contend that the relocation of the GAP display was not narrowly tailored to serve these government interests. (Pls.' Cross–Motion 46.) A regulation of speech is narrowly tailored when it does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799, 109 S.Ct. 2746. As stated by the Supreme Court, "restrictions on the time, place, or manner of protected speech are not invalid simply because there is some imaginable alternative that might be less burdensome on speech." *Id.* at 797, 109 S.Ct. 2746 (internal quotations and citations omitted). "The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted." *Id.* at 800, 109 S.Ct. 2746 (internal quotations and citations omitted).

suffered numerous unprovoked physical attacks from pro-abortion students on the first few campuses it visited, they now transport

and employ their own crowd-control barricades." (Pls.' Cross–Motion Ex. 18.)

■ I find as a matter of law that Defendants' actions in this case were narrowly tailored to serve UMBC's significant interests. Plaintiffs were not excluded from delivering their protected speech on the UMBC campus at the time and manner of their choosing. Plaintiffs were only restricted from presenting their large exhibit in their preferred location on campus, but were permitted to present the exhibit at another location, the North Lawn, where Plaintiffs would still have access to their intended audience, but where Defendants' size and safety concerns would be alleviated. Defendants' actions in relocating the display were directly related to protecting their interests in safety, visibility, and security.

■ Plaintiffs argue that the North Lawn was an unacceptable alternative to the Commons Terrace. While it is clear from the record that the North Lawn is a less trafficked area of campus during the hours in which Plaintiffs presented the GAP display, it is still a location through which students and other individuals pass and which is located near the library and the student residences. "While the alternatives may not be plaintiffs' first choice of expression, 'the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired.'" *Students Against Apartheid Coalition v. O'Neil,* 671 F.Supp. 1105, 1107 (W.D.Va.1987) (*quoting Heffron,* 452 U.S. at 647, 101 S.Ct. 2559); *see also Ward,* 491 U.S. at 802, 109 S.Ct. 2746 ("That the city's limitations on volume may reduce to some degree the potential audience for respondent's speech is of no consequence, for there has been no showing that the remaining avenues of communication are inadequate."). Given the anticipated size and format of Plaintiffs' display, the North Lawn was an acceptable alternative channel.

In sum, I find that Defendants' actions under the former Facilities Use Policy in April 2007 constituted a content-neutral reasonable time, place, and manner restriction on Plaintiffs' protected speech. Because the facts alleged, taken in the light most favorable to the party asserting the injury, do not show that Defendants' conduct violated a constitutional right, I do not need to proceed to the second prong of the qualified immunity analysis. Defendants are entitled to qualified immunity from Plaintiffs' First Amendment claims.

The same analysis is applicable to Plaintiffs' November 2007 request to reserve the Commons Terrace for their GAP display. While Defendants' size and safety concerns may have been lessened upon viewing the April 2007 display, these concerns still existed and the relocation to the North Lawn was still a reasonable time, place, and manner regulation of Plaintiffs' protected speech. According to Defendants, it was not until the October 2008 reservation request that Plaintiffs explained to the administration the specific details of their planned event or expressed a willingness to and interest in adjusting the display to fit the space available on the Terrace. (Defs.' Mem. 12; Defs.' Mem. Ex. 4, Mendez Dep. 109:3–110:10, Jan. 22, 2009; Pls.' Cross–Motion Ex. 10, Tkacik Dep. 142:3–16, Nov. 21, 2008.) At that point, the parties were able to collaboratively plan for a GAP display on the Commons Terrace that was sensitive to Defendants' concerns based on the size and format of the display and the nature of the Terrace.

(2)

■ Plaintiffs also contend that Defendants violated the Equal Protection Clause of the Fourteenth Amendment, which states that "no State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const.

amend. XIV, § 1. In analyzing an equal protection claim, a court must apply strict scrutiny if the challenged action or regulation burdens a suspect class or a fundamental right. *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 17, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). If it does not, it must be examined "to determine whether it rationally furthers some legitimate, articulated state purpose and therefore does not constitute an invidious discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment." *Id.*

 Because I find that Defendants' actions "did not unconstitutionally burden [Plaintiffs'] First Amendment rights, rational basis review is appropriate." *Busch v. Marple Newtown Sch. Dist.,* 567 F.3d 89, 99, n. 11 (3d Cir.2009) (unpublished); *see also Johnson v. Robison,* 415 U.S. 361, 375 n. 14, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974) ("Unquestionably, the free exercise of religion is a fundamental constitutional right. However, since we hold ... that the Act does not violate appellee's right of free exercise of religion, we have no occasion to apply to the challenged classification a standard of scrutiny stricter than the traditional rational-basis test."); *Rubin v. City of Santa Monica,* 308 F.3d 1008, 1019 (9th Cir.2002) ("[R]ational basis review is appropriate unless the restriction unconstitutionally burdens a fundamental right, here, the right to free speech. Because we conclude that the restrictions do not unconstitutionally burden Rubin's right of free speech, we find that neither do they violate his Equal Protection right."). Accordingly, because I find that Defendants' actions rationally further legitimate, articulated purposes, I find no equal protection violation.

As I find no genuine issue of material fact as to Plaintiffs' First Amendment or Fourteenth Amendment claim, Defendants' motion for summary judgment on Plaintiffs' as-applied claims is granted.

A separate order effecting the rulings made in this opinion is being entered herewith.

### ORDER

For the reasons stated in the accompanying Opinion, it is, this 8th day of July, 2009,

ORDERED:

1. Defendants' motion for summary judgment is granted;

2. Plaintiffs' cross-motion for summary judgment is denied; and

3. Judgment is entered in favor of Defendants.