**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 09-1892

ROCK FOR LIFE-UMBC, an unincorporated student association, for itself and its individual members; OLIVIA RICKER, individually and as an officer of Rock for Life-UMBC; MIGUEL MENDEZ, individually and as an officer of Rock for Life-UMBC,

Plaintiffs - Appellants,

v.

FREEMAN A. HRABOWSKI, individually and in his capacity as President of University of Maryland, Baltimore County; CHARLES J. FEY, in his individual capacity as former Vice President of Student Affairs at University of Maryland, Baltimore County; NANCY L. YOUNG, individually and in her official capacity as Interim Vice President of Student Affairs at the University of Maryland, Baltimore County; LEE A. CALIZO, individually and in her official capacity as Acting Director of Student Life at University of Maryland, Baltimore County; JOSEPH REIGER, individually and in his official capacity as Executive Director of the Commons at University of Maryland, Baltimore County; ERIC ENGLER, individually and in his official capacity as Acting Director of the Commons at University of Maryland, Baltimore County; LYNNE SCHAEFER, individually and in her official capacity as Vice President of Administration and Finance at the University of Maryland, Baltimore County; ANTONIO WILLIAMS, individually and in his official capacity as Chief of Police for the University of Maryland, Baltimore County Police Department,

Defendants - Appellees.

Appeal from the United States District Court for the District of Maryland, at Baltimore. J. Frederick Motz, District Judge. (1:08-cv-00811-JFM)

Argued: September 21, 2010          Decided: December 16, 2010

Before NIEMEYER and KING, Circuit Judges, and Robert J. CONRAD, Jr., Chief United States District Judge for the Western District of North Carolina, sitting by designation.

Affirmed by unpublished opinion. Judge Conrad wrote the opinion, in which Judge Niemeyer joined. Judge King wrote a separate opinion concurring in part, dissenting in part, and concurring in the judgment.

**ARGUED:** David Austin French, ALLIANCE DEFENSE FUND, Columbia, Tennessee, for Appellants. Sally Lotz Swann, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees. **ON BRIEF:** Joseph J. Martins, Travis C. Barham, ALLIANCE DEFENSE FUND, Columbia, Tennessee; Steven L. Tiedemann, JPB ENTERPRISES, INC., Columbia, Maryland, for Appellants. Douglas F. Gansler, Attorney General, Anne L. Donahue, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.

Unpublished opinions are not binding precedent in this circuit.

2

CONRAD, Chief District Judge:

Rock for Life-UMBC, a registered student organization at the University of Maryland, Baltimore County ("UMBC") and two of its former student-members appeal an award of summary judgment and judgment on the pleadings to the defendants, UMBC officials, on several First Amendment claims brought under 42 U.S.C. § 1983. For the reasons that follow, we affirm.

I.

UMBC is a public honors university located in Baltimore, Maryland, with an enrollment of approximately 13,000 undergraduate and graduate students. Rock for Life is a registered student organization at UMBC with a stated mission "to defend the right of the unborn and to awake consciousness and awareness in the UMBC community about the catastrophic effects of abortion for all persons involved and our moral duty to stop its practice." Joint Appendix ("JA") 17.[1] In April 2007, Rock for Life submitted a request to UMBC to reserve non-

---

[1] At oral argument, counsel for the defendants informed the Court that Rock for Life is as of recently no longer a registered student organization at UMBC. Because the evidence supporting this factual development was not made clear, nor is Rock for Life's current status at UMBC material to a number of its claims, we assume for purposes of this decision that Rock for Life continues to operate as a registered student organization.

academic campus space in order to display a series of posters known as the Genocide Awareness Project (the "GAP display"). The display is described by its sponsor, the Center for Bio-Ethical Reform, as

> a traveling photo-mural exhibit which compares the contemporary genocide of abortion to historically recognized forms of genocide. It visits university campuses around the country to show as many students as possible what abortion actually does to unborn children and get them to think about abortion in a broader historical context.

Id. at 253, 254-55. There are twenty-four different GAP posters, and each comes in a six-foot by thirteen-foot "standard" or four-foot by eight-foot "mini-GAP" display size.

At the time of Rock for Life's initial request, UMBC operated under a facilities use policy designed to provide recognized student organizations with access to academic and non-academic university property. UMBC evaluated requests based on "room appropriateness," and it reserved the right to deny any request "dependent upon circumstances." Id. at 234. The policy also stated that "[s]cheduling may move an event to a different location without notice. UMBC is not responsible for any costs incurred by a user resulting from a change in location." Id. at 235.

Rock for Life initially sought permission to present the GAP display at the University Center Plaza, a facility located

4

at the center of several academic buildings on the western side of campus. The request was first sent to Lee Calizo, director of student life, for approval. On April 24th, Calizo emailed then-acting Rock for Life president Alex Vernet to inform him that she had viewed a website associated with GAP and was concerned that placing "7 ft tall by 22 ft wide" signs in front of the Plaza entrance would restrict access to the building. Id. at 824. In fact, Rock for Life only planned to display four-foot by eight-foot "mini-GAP" signs. However, it does not appear that Rock for Life brought this discrepancy to Calizo's or any other UMBC official's attention during their subsequent negotiations.

As word spread of Rock for Life's request to show the GAP display, UMBC officials discussed how best to handle the controversial nature of the event. The plaintiffs allege Chris Tkacik, UMBC's in-house counsel, stated that students might feel "emotionally harassed" by the display, and UMBC had a right to prevent such harassment. The plaintiffs contend this alleged comment implicated two additional UMBC speech policies then in place. The first is former Article V, Paragraph B(2)(f) of the Code of Student Conduct, which prohibited "physical or emotional harassment," although this term was not further defined. Id. at 62. The second is UMBC's prohibition against sexual harassment, defined as

5

unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:

(1) Such conduct has the purpose or effect of unreasonably interfering with an individual's academic or work performance, or of creating an intimidating, hostile, or offensive educational or working environment; or
(2) Submission to such conduct is made either explicitly or implicitly a term or condition of employment or for participation in a UMBC-sponsored educational program or activity; or

(3) Submission to or rejection of such conduct by an individual is used as the basis for academic or employment decisions.

JA 51. A violation of either provision subjects a student to a range of possible disciplinary measures, including suspension and expulsion from the university.

During a meeting between UMBC, Rock for Life, and the Leadership Institute,[2] Rock for Life presented UMBC with a letter requesting a uniformed police presence during the GAP display due to "numerous unprovoked physical attacks from pro-abortion students" during previous exhibitions. Id. at 270. Further, it was Rock for Life's position that the First Amendment required UMBC to pay the cost of this security measure. The parties, however, never reached a definite agreement on whether police should be assigned to the event, and if so, who should pay for the costs.

_____

[2] The Leadership Institute is a non-profit organization that assisted Rock for Life in bringing the GAP display to UMBC.

6

On April 25th, 2007, Calizo informed Rock for Life that the GAP display would not be allowed at the University Center Plaza, but could be held at the Commons Terrace instead. The Commons Terrace is a patio area adjacent to the Commons, described as the "hub of student life on campus," and its positioning within the campus makes it a "congestion point" between residence halls and other campus buildings. Id. at 835, 1356. Rock for Life found the Terrace to be a desirable location and agreed to this compromise. However, Joseph Reiger, Executive Director of the Commons, soon expressed concern that the Terrace was also an inappropriate place for the GAP display. He described steps on the Terrace as hazardous because they are not in a "known sight line." (JA 1356). He further stated that like Calizo, he understood the GAP display to include about twelve five-foot by thirteen-foot signs. Based on these circumstances, Reiger thought the Terrace was an unsuitable venue for three reasons: (1) the GAP signs were too much of a "visual barrier" for that location; (2) the GAP display would not leave adequate space for pedestrians wishing to access the Commons through the Terrace entrance; and (3) the area would become too congested if students had to "flee" from a violent altercation resulting from the display. Id. at 1363. Reiger further stated that his concern about violence arose because of Rock for Life's letter

7

requesting security, not his past experience with the group or UMBC's student body.

Based largely on Reiger's recommendation, Charles Fey, Vice President of Student Affairs, decided to move the GAP display once more from the Commons Terrace to the North Lawn, an open space between the Commons, residence halls and main library. Rock for Life members were informed of this decision by Eric Engler, acting director of the Commons, on the morning of April 30th as they attempted to set up the GAP display on the Commons Terrace. Rock for Life then moved the display to the North Lawn, where it was held without a police presence and without incident. The plaintiffs contend that surveillance footage from that day indicates the North Lawn saw less foot traffic than the Terrace, and thus fewer students were able to view the GAP display and its message.

In November 2007, Rock for Life made a second attempt to reserve the Commons Terrace for an exhibition of the GAP display. UMBC responded that as before, the GAP display would be permitted only on the North Lawn. Rock for Life decided not to hold the event.

The plaintiffs later filed suit under 42 U.S.C. § 1983 in the District of Maryland, alleging that UMBC had violated their right to free expression through the enforcement of its sexual harassment policy, its policy prohibiting emotional harassment

8

and, most directly, its facilities use policy. Calizo, Reiger, Engler and Fey were named in both their individual and official capacities, as were Freeman Hrabowski, President of UMBC, Nancy Young, successor to Fey as Vice President of Student Affairs, Lynne Schaeffer, Vice President of Administration and Finance and Antonio Williams, University Chief of Police.[3] The complaint sought permanent injunctive relief against enforcement of all three policies as well as nominal and punitive damages. UMBC later agreed, however, to partially address the plaintiffs' claims by striking "emotional harassment" from the list of prohibitions in its code of conduct and replacing it with "failure to cease repetitive unwanted behavior directed toward a particular individual or individuals." JA 81. UMBC also revised its facilities use policy by adding specific criteria for denying or moving an event, but the sexual harassment policy remained unchanged. After the facilities use policy was revised, Rock for Life made a third request in October 2008 to reserve the Commons Terrace for an exhibition of the GAP display. UMBC

---

[3] The district court held that Hrabowski, Young, Schaeffer, and Williams were immune from liability because the plaintiffs failed to present any evidence of their personal or supervisory involvement in the state action giving rise to this lawsuit. See Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (only a supervisor who exhibits "deliberate indifference to or tacit authorization of" a subordinate's constitutional violations may be held responsible under § 1983). The plaintiffs do not challenge this finding on appeal.

granted this request, and the GAP display was held on the Commons Terrace without incident.

In light of these developments, the plaintiffs filed an amended complaint withdrawing their claims for injunctive relief against enforcement of UMBC's code of conduct and facilities use policy. The amended complaint alleged five causes of action under § 1983, better expressed in terms of the speech policies they challenged: (1) First Amendment and Due Process claims against UMBC's sexual harassment policy, seeking injunctive relief as well as monetary damages; and (2) First Amendment, Due Process and Equal Protection claims against UMBC's code of conduct and facilities use policy, seeking monetary damages only.

Finding that the plaintiffs lacked standing to assert claims for injunctive relief against the code of conduct and sexual harassment policy, the district court granted judgment on the pleadings to the defendants on those claims under Federal Rule of Civil Procedure 12(c). Rock for Life-UMBC v. Hrabowski, 594 F. Supp. 2d 598 (D. Md. 2009) (hereafter "Rock for Life I"). After discovery, the parties filed cross-motions for summary judgment on the plaintiffs' remaining claims. The district court awarded judgment to the defendants, finding that the plaintiffs' facial challenge to the former facilities use policy was moot, and the policy had been applied without regard to content as a

10

reasonable time, place, and manner regulation of their speech. Rock for Life-UMBC v. Hrabowski, 643 F. Supp. 2d 729 (D. Md. 2009) (hereafter "Rock for Life II").

The plaintiffs timely appealed the district court's orders granting judgment on the pleadings and summary judgment to their First Amendment claims only. We have jurisdiction pursuant to 28 U.S.C. § 1291.

II.

We review a district court's decision to grant judgment on the pleadings under Rule 12(c) de novo. Independence News, Inc. v. City of Charlotte, 568 F.3d 148, 154 (4th Cir. 2009). "In reviewing an award of judgment on the pleadings, we assume the facts alleged in the relevant pleadings to be true, and we draw all reasonable inferences therefrom." Volvo Const. Equip. N. Am., Inc., v. CLM Equip. Co., Inc., 386 F.3d 581, 591 (4th Cir. 2004).

We also review an award of summary judgment de novo under the same standard applied by the district court. See Canal Ins. Co. v. Distrib. Servs., Inc., 320 F.3d 488, 491 (4th Cir. 2003). Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

11

Fed. R. Civ. P. 56(c). When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

Because the plaintiffs' § 1983 claims seek to recover damages, they must establish not only that the defendants deprived them of a constitutional right, but also that the defendants, state actors sued in their individual capacities, are undeserving of qualified immunity. See Harlow v. Fitzgerald, 457 U.S. 800, 808-09 (1982). Whether a government official is deserving of qualified immunity from personal liability is a two-pronged inquiry that requires us to determine: (1) whether the official violated a constitutional right; and if so (2) whether the right was "clearly established" at the time of its violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). Recently the Supreme Court overruled Saucier in part to hold that the traditional two-step inquiry into qualified immunity is not mandatory; "the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding

12

which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 129 S. Ct. 808, 813, 818 (2009). In this case, the district court addressed step one of the inquiry and, after concluding that the plaintiffs failed to present sufficient evidence of a constitutional violation, found it unnecessary to address step two.

## III.

We begin with the district court's conclusion that the plaintiffs lack standing to challenge UMBC's sexual harassment policy and code of conduct. "[S]tanding jurisprudence contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement . . . and prudential standing, which embodies judicially self-imposed limits on the exercise of federal jurisdiction." Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11 (2004). Article III standing requires a plaintiff to show: (1) injury-in-fact; (2) a causal connection or traceability; and (3) redressability. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). The injury-in-fact criteria contemplates that the alleged injury-in-fact is both "concrete and particularized and actual or imminent." Id. at 560. The term "particularized" means that "the injury must affect the plaintiff in a personal and

13

individual way." Id. at 560 n.1. In addition, "there must be a causal connection between the injury and the conduct complained of . . . ." Id. at 560. Stated differently, the injury must be "fairly traceable" to action by the defendant. Id. Finally, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. at 561 (internal quotation marks omitted).

A regulation that burdens speech creates a justiciable injury if on its face it restricts expressive activity by the class to which the plaintiff belongs, or if its presence otherwise tends to chill the plaintiff's exercise of First Amendment rights. N.C. Right to Life, Inc. v. Bartlett, 168 F.3d 705, 710 (4th Cir. 1999). However, fears of enforcement that are "imaginary" or "wholly speculative" are insufficient to confer standing. Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 302 (1979). To establish a plaintiff's standing under Article III, the challenged regulation must present a credible threat of enforcement against the party bringing suit. N.C. Right to Life, Inc. v. Bartlett, 168 F.3d 705, 710 (4th Cir. 1999). A plaintiff must establish such a threat with respect to each of the provisions it seeks to challenge, as standing regarding one aspect of a policy cannot be bootstrapped into standing as to the rest. See Covenant Media of S.C., LLC v. City of N. Charleston, 493 F.3d 421, 429-30 (4th Cir. 2007).

14

A.

The plaintiffs argue that their standing to challenge UMBC's sexual harassment policy is rooted in its unconstitutional overbreadth. However, while the overbreadth doctrine permits a plaintiff to "challenge a statute on its face because it also threatens others not before the court[,]" Bd. of Airport Comm'rs v. Jews for Jesus, Inc., 482 U.S. 569, 574 (1987); accord Broadrick v. Oklahoma, 413 U.S. 601, 612 (1973), it does not circumvent the requirement that a plaintiff suffer an individual injury from the existence of the contested provision to begin with. Burke v. City of Charlestown, 139 F.3d 401, 405 n.2 (4th Cir. 1998); Gilles v. Torgersen, 71 F.3d 497, 501 (4th Cir. 1995) (citing Sec'y of Md. v. Joseph H. Munson Co., Inc., 467 U.S. 947, 958 (1984)). To demonstrate a credible threat that a sexual harassment policy is likely to be enforced in the future, a history of threatened or actual enforcement of the policy against the plaintiff or other similarly-situated parties will often suffice. See Lopez v. Candaele, --- F.3d ----, 2010 WL 3607033, at *6 (9th Cir. Sept. 17, 2010); Booher v. Bd. of Regents, No. 2:96cv135, 1998 U.S. Dist. LEXIS 11404, at *19-20 (E.D. Ky. July 21, 1998); Doe v. Univ. of Michigan, 721 F. Supp. 852, 859-60 (E.D. Mich. 1989).

The plaintiffs cite the recent Third Circuit decision McCauley v. University of the Virgin Islands, --- F.3d ----,

15

2010 WL 3239471 (3d Cir. Aug. 18, 2010), for the proposition that Broadrick and its progeny confer standing to challenge speech regulations absent evidence of a chilling effect to the particular speaker before the court. See id. at *3 (holding that a plaintiff had standing to challenge a university's sexual harassment policy despite the fact that he failed to assert that "his speech . . . was chilled by the Code."). Broadrick, however, cannot be read so broadly. While the overbreadth doctrine relaxes prudential limitations on standing that would normally prevent a plaintiff from vindicating the constitutional rights of other speakers, it does not dispense with the "obligat[ion] as an initial matter to allege a distinct and palpable injury as required by Article III." Burke, 139 F.3d at 405 n.2; accord Canatella v. State of California, 304 F.3d 843, 854 & n.14 (9th Cir. 2002) (Broadrick relaxes prudential, but not Article III, standing requirements).

Upon review of the facts alleged in the plaintiffs' amended complaint, nothing suggests that the plaintiffs face a credible threat of disciplinary action under UMBC's sexual harassment policy. As the district court noted, no aspect of the GAP display is readily applicable to the policy's definition of "sexual harassment," which is limited to "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature . . . ." Although the GAP

16

display seeks to convey a message related to abortion, which necessarily touches upon issues related to gender and reproduction, this type of speech is simply not "conduct of a sexual nature" covered by the policy. Moreover, the plaintiffs do not allege facts suggesting that UMBC officials ever threatened to punish their speech as sexual harassment. Even if Tkacik expressed concern, as the amended complaint alleges, that students would feel "emotionally harassed" by the GAP demonstration, he did not express concern that students would feel sexually harassed, nor is there any suggestion that disciplinary enforcement of the sexual harassment policy was discussed at any point. More to the point, Rock for Life has now shown the GAP display on campus twice and has not faced threatened or actual disciplinary action for sexual harassment. Although the plaintiffs claim a chilling effect to their speech, they were unable at oral argument to name any form of expressive activity that Rock for Life or its members wish to engage in, but refrain from in fear of violating UMBC's sexual harassment policy. We hold, therefore, that the plaintiffs have not demonstrated a credible threat of enforcement under UMBC's sexual harassment policy and are without standing to challenge its constitutionality.

B.

Tkacik's alleged comment had more relevance to UMBC's code of conduct, which prohibited "emotional harassment" until that phrase was excised from the code during the course of this litigation. As a result, the plaintiffs concede that the code of conduct is no longer unconstitutionally vague or overbroad. Nevertheless, the plaintiffs assert standing to sue for monetary damages on the theory that Tkacik's mention of the phrase caused them to chill their own speech.

We have recognized that an actual chilling of protected speech is a discrete infringement of First Amendment rights that gives rise to a claim under § 1983 for at least nominal damages. See Reyes v. City of Lynchburg, 300 F.3d 449, 453 (4th Cir. 2002). However, the plaintiffs may not assert claims for damages against a speech policy that was never actually applied to them. In order to establish their standing to challenge UMBC's code of conduct, the plaintiffs must first demonstrate an injury-in-fact through the application of that provision. Covenant Media of S.C., LLC v. City of North Charleston, 493 F.3d 421, 429-30 (4th Cir. 2007) (citing FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 230 (1990)). While the plaintiffs claim that the code of conduct caused them to chill their own speech, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm . . . ." Laird v. Tatum, 408

18

U.S. 1, 13-14 (1972). "[F]or purposes of standing, subjective chill requires some specific action on the part of the defendant in order for the litigant to demonstrate an injury-in-fact." Morrison v. Board of Educ., 521 F.3d 602, 609 (6th Cir. 2008).

In this case, UMBC never undertook a "concrete act" to investigate or sanction the plaintiffs for violation of the code of conduct. Id. at 610. Nor can the plaintiffs characterize the defendants' decision to move the GAP display to the North Lawn as a non-disciplinary enforcement of the code. If the defendants considered the display to be emotional harassment, then it was equally so on either the North Lawn or the Commons Terrace. Any subjective fear of disciplinary measures that the plaintiffs might have felt never materialized into an actual, objective harm. Nor is there a credible threat of enforcement in the future, as the sexual harassment policy has been revised so that it now prohibits specific conduct the plaintiffs have never sought to engage in. The plaintiffs' mere allegations of a chilling effect, absent any substantiating action taken by UMBC, cannot establish their standing to challenge the constitutionality of a now-defunct speech regulation.

IV.

Unlike UMBC's sexual harassment policy and its code of conduct, UMBC actually applied its facilities use policy to

19

regulate the plaintiffs' speech. As such, they have standing to challenge its constitutionality. The plaintiffs assert a facial challenge to the policy, alleging that its "dependent upon circumstances" and "move without notice" provisions failed to create "narrow, objective, and definite standards to guide the licensing authority," Green v. City of Raleigh, 523 F.3d 293, 300 (4th Cir. 2008) (quoting Forsyth Cnty. v. Nationalist Movement, 505 U.S. 123, 131 (1992)), as well as an as-applied challenge to the defendants' decision to remove the GAP display from the Commons Terrace.

A.

Citing our decision in Valero Terrestrial Corp. v. Paige, 211 F.3d 112 (4th Cir. 2000), the district court held that the plaintiffs' facial challenge to the facilities use policy was moot in light of its permanent revisions, which the plaintiffs concede are sufficient to render the policy facially constitutional. Rock for Life II, 643 F. Supp. 2d at 740-41. In Valero, which addressed the mootness of a plaintiff's claim for injunctive relief against enforcement of several state regulatory statutes, we held that "statutory changes that discontinue a challenged practice are 'usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed.'" 211 F.3d at 116 (quoting Native Village of Noatak v. Blatchford, 38 F.3d

20

1505, 1510 (9th Cir. 1994)). Valero, however, is inapposite to a claim brought under § 1983 to recover damages—either compensatory or nominal—resulting from a prior suppression of speech. In this context, we have held that even permanent remedial measures will not moot the claim. See Covenant Media, 493 F.3d at 429 n.4 (citing Henson v. Honor Comm. of the Univ. of Va., 719 F.2d 69, 72 n.5 (4th Cir. 1983)); Reyes, 300 F.3d at 453. But while the plaintiffs' cause of action for damages remains live, their claim that the policy was facially unconstitutional is moot.

We addressed a similar issue in Reyes, where a plaintiff sought to recover nominal damages after being charged with violating a subsequently repealed parade ordinance, arguing among other things that the ordinance was facially overbroad. 300 F.3d at 452. We found the plaintiff's overbreadth challenge to the ordinance mooted by its repeal, observing that "the repealed parade ordinance cannot now, if it ever did, reach any amount of constitutionally protected conduct. The question of overbreadth does not present a live case or controversy for this court." Id. at 453 (footnote omitted). We reached this result because a facial challenge premised on overbreadth is necessarily forward-thinking: it petitions the court to invalidate an overbroad speech regulation because it has the potential to support "a substantial number of impermissible

21

applications . . . ." New York v. Ferber, 458 U.S. 747, 771 (1982). When a facially overbroad regulation is subsequently narrowed within constitutional boundaries, the inherent threat of content-based discrimination becomes null.

Here, the plaintiffs allege the former facilities use policy was facially unconstitutional because it delegated "unbridled discretion" to UMBC to grant or deny requests. App. Br. at 55. This, too, is a facial challenge premised on overbreadth. See Forsyth, 505 U.S. at 129 ("[T]he Court has permitted a party to challenge an ordinance under the overbreadth doctrine in cases where every application creates an impermissible risk of suppression of ideas, such as an ordinance that delegates overly broad discretion to the decisionmaker[.]"). The injury alleged by the plaintiffs is not that Rock for Life's request was actually denied based on the content of its speech, for "[f]acial attacks on the discretion granted a decisionmaker are not dependent on the facts surrounding any particular permit decision." Id. at 133 n.10 (citing Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 770 (1988)). Rather, it is an assertion by the plaintiffs that the facilities use policy granted UMBC such broad discretion that it created a potential chilling effect on all protected expression on campus, including their own. Id. at 129. If the policy was indeed facially overbroad, UMBC's permanent revisions

22

cured this defect and removed any threat of content-based enforcement in the future. The justiciable issue that remains before us is not whether Rock for Life's permit was denied pursuant to a facilities use policy that gave UMBC unduly broad discretion, i.e., a policy that could have been applied unconstitutionally, but whether impermissible content-based discrimination did in fact occur. Because the facilities use policy no longer poses an inherent threat of content-based discrimination, the plaintiffs' facial challenge to the policy is moot notwithstanding the fact that it seeks the recovery of damages rather than injunctive relief.

B.

Turning to the plaintiffs' as-applied challenge, the district court correctly determined that the facilities use policy regulated access to a limited public forum, and an "internal standard" applied because the policy was designed to provide access to recognized student organizations such as Rock for Life. Rock for Life II, 643 F. Supp. 2d at 744-45. Under this standard, content-neutral regulations of speech are permissible if they are "limited to 'reasonable restrictions on time, place, or manner . . . [,] provided the restrictions . . . are narrowly tailored to serve a significant government interest, and . . . leave open ample alternative channels for communication of the information.'" Warren v. Fairfax Cnty., 196

23

F.3d 186, 193 (4th Cir. 1999) (en banc) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)). A narrowly tailored regulation of speech "need not be the least restrictive or least intrusive means of" effectuating the government's interests, Ward, 491 U.S. at 798, but it may not "burden substantially more speech than is necessary to further [those] . . . interests." Id. at 799. To be sure, "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." Heffron v. Int'l Society for Krishna Consciousness, Inc., 452 U.S. 640, 647 (1981). However, the plaintiffs contend that whether the facilities use policy was applied in a content-neutral manner is a question of fact for the jury. We agree, although the question is a much narrower one than the plaintiffs suggest.

The defendants' stated reasons for moving the GAP display because of its size and shape are content-neutral criteria for time, place and manner restrictions, see Am. Legion v. City of Durham, 239 F.3d 601, 608 (4th Cir. 2001) ("Size . . . is not a content criterion."), and the plaintiffs fail to demonstrate sufficient evidence that these stated reasons were pretext. The defendants believed the size and shape of the signs would have created a visual barrier obscuring steps and slopes on the Commons Terrace, which Calizo characterized as an "oddly shaped area." JA 715. They developed this concern after their own

24

internet research about the GAP project led them to believe that Rock for Life planned to display a row of approximately twelve six-foot by thirteen-foot GAP signs. In fact, Rock for Life's display only included eight four-foot by eight-foot "mini-GAP" signs, which could be arranged in any shape to accommodate floor space limitations. However, whether the defendants' decision was motivated by the content of the GAP display depends on the circumstances as the defendants believed them to be, not as they actually were. The emails exchanged between the parties should have alerted the plaintiffs to this mistake and the defendants' resulting concerns for visibility and safety. The plaintiffs never attempted to correct this misunderstanding during the challenged enforcement of the facilities use policy, nor have the plaintiffs otherwise shown that the defendants arrived at their conclusions about the GAP signs in bad faith. Although the plaintiffs have presented sufficient evidence that the defendants were mistaken about the size of the GAP signs, this is not evidence relevant to the issue before us: whether their decision was motivated by the content of the plaintiffs' speech rather than its manner of presentation.

The plaintiffs also suggest that the defendants' above-stated logistical concerns are pretext for content-based discrimination because numerous other events that posed similar concerns were permitted on the Commons Terrace. We note that

25

"[o]nce a limited or designated public forum is established the government can not exclude entities of a similar character to those generally allowed." ACLU v. Mote, 423 F.3d 438, 443 (4th Cir. 2005). From 2003 to 2008, a number of events with varying attendance have been held on the Terrace during normal school hours.[4] But of these events, none were shown to include large signs similar to those UMBC believed it was dealing with. Thus, there is a content-neutral basis to distinguish these other events from the GAP display.

A different matter is presented by the defendants' stated reason that they moved the GAP display to provide adequate space for students to flee in the event of a violent altercation. This concern was raised by UMBC in response to a request from Rock for Life to provide a police presence at the GAP display, due to "numerous unprovoked physical attacks" during prior exhibitions at other campuses. The district court determined that the

---

[4] These events include a free concert held from 1:00 p.m. to 2:00 p.m., attended by 50 people; an outdoor prayer service held from 1:00 p.m. to 1:45 p.m., attended by 75 people; a student involvement festival held from 11:00 a.m. to 2:00 p.m., attended by 1,500 people; a study abroad fair held from 10:00 a.m. to 3:00 p.m., attended by 200 people; a "Bealtaine Barbeque" (a Gaelic pagan festival) held from 12:00 p.m. to 2:00 p.m., attended by 25 people; a display erected by the sailing club from 10:00 a.m. to 3:00 p.m.; a "Teeter Totter-a-thon" fundraising event held for 24 hours, attended by 60 participants; and an environmental fair held from 2:00 p.m. to 10:00 p.m., attended by 50 people and featuring an electric car placed at the South entrance of the Terrace. JA 1673-90.

26

defendants had not acquiesced to a "heckler's veto" by moving the GAP display because their concerns about crowd violence were first raised by the plaintiffs. Rock for Life II, 643 F. Supp. 2d at 746-47. However, regardless of who raises the issue, "[l]isteners' reaction to speech is not a content-neutral basis for regulation." Forsyth, 505 U.S. at 134. It is difficult if not impossible to characterize UMBC's heightened interest in providing escape routes from the Commons Terrace as anything but content-based. See Ovadal v. City of Madison, 416 F.3d 531, 537 (7th Cir. 2005) (a content-based restriction of speech is likely when "every proffered justification" for the restriction is "directly related to the reactions" of the audience). While an interest in public safety is a content-neutral basis to regulate speech, see Davenport v. City of Alexandria, 710 F.2d 148, 151 (4th Cir. 1983) (en banc), safety concerns arising from a prediction of how listeners might react to speech cannot be effectively de-coupled from speech content. Although, as the district court noted, the defendants "should not be faulted for taking seriously the concerns raised by [the plaintiffs]," Rock for Life II, 643 F. Supp. 2d at 747, those concerns arose from the content of the plaintiffs' message.

Viewing the evidence in a light most favorable to the plaintiffs, it appears the defendants were motivated by both content-based and content-neutral reasons when they denied Rock

for Life access to the Commons Terrace. A content-based restriction of speech withstands constitutional scrutiny only when narrowly tailored and necessary to serve a compelling state interest. Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. 666, 677 (1998). Even were we to find UMBC's interest in protecting the safety of its students compelling, acquiescence to a heckler's veto would still fail under strict scrutiny, for the defendants must employ the least restrictive means available to further that interest. United States v. Playboy Entertainment Group, Inc., 529 U.S. 803, 813 (2000). Providing a security presence at the Commons Terrace would have been a less restrictive means of ensuring student safety. This is especially true in light of the fact that the defendants decided to move the event before the GAP display was even set up, permitting them no opportunity to make an assessment of how students actually reacted to the plaintiffs' speech. The defendants could not have been certain that any real threat of violence existed. Given that Rock for Life has now held the GAP display twice on campus without incident, it most likely did not.

Although Rock for Life was permitted to present the GAP display on the North Lawn, where its message was heard by students walking across campus, "[a] tax based on the content of speech does not become more constitutional because it is a small tax." Forsyth, 505 U.S. at 136. The plaintiffs have therefore

demonstrated a violation of their First Amendment rights unless the defendants could show, by a preponderance of evidence, that absent any concerns of violence they would still have moved the GAP display because of its size and shape. See Mt. Healthy City School Dist. v. Doyle, 429 U.S. 274, 287 (1977) (a First Amendment violation must be the "motivating factor" behind a challenged state action; no constitutional violation occurs if the government can show by a preponderance of the evidence that it would have taken the same action for other, constitutionally proper, reasons); see also Daker v. Ferrero, 506 F. Supp. 2d 1295, 1309 (N.D. Ga. 2007) (applying the Mt. Healthy "proximate cause" framework to a prisoner's First Amendment claim for suppression of speech).

Because the plaintiffs have demonstrated a triable issue of fact on their as-applied challenge to the facilities use policy, we hold that the district court erred by awarding summary judgment to the defendants at the first prong of the Saucier test for qualified immunity.

V.

Although the district court erred in this regard, we may nevertheless affirm summary judgment if we determine as a matter of law that the plaintiffs fail to demonstrate a violation of a constitutional right that was clearly established. This is a

"purely legal question . . . ." Siegert v. Gilley, 500 U.S. 226, 232 (1991). It requires the court to identify "the specific right allegedly violated," and then decide if "at the time of the alleged violation the right was clearly established." Pritchett v. Alford, 973 F.2d 307, 312 (4th Cir. 1992). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. "To determine whether a federal right was clearly established at the time of the defendants' alleged conduct, we focus not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." Jackson v. Long, 102 F.3d 722, 728 (4th Cir. 1996) (internal quotation marks omitted). We are advised to resolve the issue of qualified immunity at the "earliest possible stage" of litigation. Pearson, 129 S. Ct. at 815.

The plaintiffs argue that the we may not address the issue of qualified immunity while material issues of fact remain concerning the defendants' conduct or their intent. Generally speaking, "summary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants." Buonocore v. Harris, 65 F.3d 347, 359-60 (4th Cir. 1995) (citing Pritchett,

30

973 F.2d at 313). In <u>Jackson</u>, however, we recognized that "[i]f . . . resolution of the factual dispute is immaterial to whether immunity is to be afforded," we may address the question of qualified immunity while fact issues remain outstanding. 102 F.3d at 727.

Here, the only issue of fact relevant to the plaintiffs' as-applied challenge that would survive summary judgment is whether the defendants' violence-related safety concerns were the proximate cause of their decision to remove the GAP display from the Commons Terrace. While this is a fact issue relevant to whether the plaintiffs have suffered a deprivation of their First Amendment rights, it is one that we may resolve in their favor for purposes of determining whether the defendants are entitled to qualified immunity. The defendants maintain that they became concerned about the potential for violence after Rock for Life presented UMBC with a letter asking for security and describing violent encounters on other campuses. The plaintiffs have not shown this concern was exaggerated or otherwise not sincerely held.[5] Assuming, then, that the

---

[5] In briefing submitted to the district court, the plaintiffs suggested that the defendants' concern of violence was not "real." Doc. No. 60-1 at 37. The plaintiffs supported this contention by showing that UMBC refused to pay for a security presence at the GAP display. <u>Id.</u> However, whether UMBC agreed to pay for security is a separate question from whether it had concerns for student safety.

defendants made an impermissible content-based restriction of the plaintiffs' speech because they anticipated a hostile reaction from listeners, we exercise our discretion under Pearson to examine whether this violated a constitutional right of the plaintiffs' that was, at the time, clearly established.

"Historically, one of the most persistent and insidious threats to first amendment rights has been that posed by the 'heckler's veto,' imposed by the successful importuning of government to curtail 'offensive' speech at peril of suffering disruptions of public order." Berger v. Battaglia, 779 F.2d 992, 1001 (4th Cir. 1985). Courts have recognized a heckler's veto as an impermissible form of content-based speech regulation for over sixty years. See Terminiello v. City of Chicago, 337 U.S. 1 (1949). Repeatedly, courts have emphasized the state's responsibility to permit unpopular or controversial speech in the midst of a hostile crowd reaction. See, e.g., Ovadal, 416 F.3d at 537; Smith v. Ross, 482 F.2d 33, 37 (6th Cir. 1973); Grider v. Abramson, 994 F. Supp. 840, 845-46 (W.D. Ky. 1998), cited in Cheryl A. Leanza, Heckler's Veto Case Law as a Resource for Democratic Discourse, 35 Hofstra L. Rev. 1305, 1311 n.49 (2007). In the abstract, at least, the impermissibility of a heckler's veto is clearly established by First Amendment jurisprudence.

32

Our inquiry, however, is not meant to be performed in the abstract. "Put simply, context matters." Henry v. Purnell, --- F.3d ---, 2010 WL 3720411, at *11 (4th Cir. Sept. 24, 2010). As the United States Supreme Court has stated,

> if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of Harlow. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. Harlow would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages."

Anderson v. Creighton, 483 U.S. 635, 639 (1987) (quoting Davis v. Scherer, 468 U.S. 183, 195 (1984)). Our inquiry into whether the defendants violated a clearly established right of the plaintiffs' not to be silenced by a heckler's veto must account for the fact that it was the plaintiffs who issued a warning of crowd violence to the defendants in the first place. Although it does not render the defendants' conduct permissible under the First Amendment, the letter bears upon context and the circumstances as the defendants perceived them.

The plaintiffs' letter warned that the GAP display had encountered "numerous unprovoked physical attacks from pro-

33

abortion students on the first few campuses it visited . . . ." JA 270. Public universities are taxed with a dual responsibility to permit the free expression of ideas on campus while providing for the safety and security of their students, see S.U.N.Y. v. Fox, 492 U.S. 469, 475 (1989), and the plaintiffs' security concerns put these interests at odds. The proposed location for the GAP display, the Commons Terrace, posed in the defendants' minds an additional safety hazard in the event of crowd violence. The plaintiffs' apparent expectation that such violence would occur must have left the defendants uniquely on edge.

In hindsight, we think the defendants were required by the First Amendment to address these additional safety concerns by providing a security presence at the GAP display, or watching the event closely to determine whether security was truly necessary. However, "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular [government] conduct." Saucier, 533 U.S. at 205. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). If the defendants secured campus safety at too high a cost to the plaintiffs' right to free expression, we do not believe they should be made to pay for this mistake from their own pockets.

34

VI.

In summary, we conclude that all claims except the plaintiffs' as-applied challenge to UMBC's facilities use policy were properly dismissed on standing or mootness grounds. Although the district court erred by holding that the plaintiffs failed to demonstrate a triable issue of fact whether the defendants regulated their speech based on its content, the defendants are nevertheless entitled to qualified immunity from 42 U.S.C. § 1983 claims brought against them in their individual capacities.

<u>AFFIRMED</u>

KING, Circuit Judge, concurring in part, dissenting in part, and concurring in the judgment:

I write separately to confirm my concurrence in — and admiration for — most of Judge Conrad's well-crafted majority opinion, with the exceptions of Parts IV.B and V. Although I fully agree with the majority that the defendants are entitled to qualified immunity on the plaintiffs' as-applied challenge to UMBC's policy on facilities use, I would resolve that issue solely on the first prong of the Saucier test. More specifically, I would rule that the defendants are entitled to qualified immunity because no constitutional violation has been shown. I therefore dissent as to Part IV.B of the majority opinion, which addresses the first prong of Saucier (the constitutional violation prong), and have no reason to reach the second prong of Saucier (the clearly established prong) addressed in Part V of the majority opinion.

I.

The test formulated by the Supreme Court in Saucier v. Katz required a two-pronged "order of battle" assessment of a qualified immunity claim. See 533 U.S. 194, 201 (2001). After Saucier was rendered in 2001, a reviewing court was obliged to assess the two prongs in sequence, asking first whether the plaintiff had sufficiently established a constitutional

36

violation. If the court's answer on the first prong was "no," then it could not proceed to or address the second prong. But if the answer was "yes," then the court was obliged to decide whether the violation was of a clearly established constitutional right. In 2009, however, in Pearson v. Callahan, the Supreme Court unanimously receded from Saucier's mandatory "order of battle," deciding that a reviewing court was no longer required to address the two prongs of the Saucier analysis in sequence, but could exercise its "sound discretion" to decide the proper order of assessment. See 129 S. Ct. 808, 813, 818 (2009).

The Pearson rule was in large measure predicated on the Court's recognition that "[a]dherence to Saucier's two-step protocol departs from the general rule of constitutional avoidance." 129 S. Ct. at 821 (citing, inter alia, Ashwander v. TVA, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.")). The Pearson rule, however, also responded to another substantial and valid concern that arose from Saucier's mandatory sequence protocol — that a defendant could suffer an adverse decision on the constitutional violation prong, prevail on the clearly established prong (and thus secure a favorable judgment), but

37

yet be unable to seek and secure appellate review on the adverse constitutional violation ruling.  Id. at 820.

## A.

In this case, the majority's ruling on Saucier's first prong — the constitutional violation question addressed in Part IV.B — is patently incorrect.  Before elaborating, however, I must emphasize and address a more fundamental flaw in the majority's resolution of this appeal.  Put simply, the majority's ruling on Saucier's first prong constitutes unnecessary dicta on a constitutional question, contravening the principles spelled out in Pearson.  Indeed, the majority recognizes in Part V of its opinion (under Saucier's second prong) that the constitutional right it identifies in Part IV.B is not clearly established.  Under the Pearson rule, therefore, the majority should not have addressed the merits of the constitutional violation issue (under Saucier's first prong) absent some good reason, such as a compelling need to "promote[] the development of constitutional precedent."  129 S. Ct. at 818.  In my view, no such compelling need or other good reason is present here.  Thus, the proper course for the majority was simply to assume that a constitutional violation had occurred, and then proceed to address the "clearly established" prong of Saucier, granting qualified immunity and summary judgment on the basis of its Part V ruling.  In proceeding as it does, however,

38

the majority has departed from the post-Pearson settled practice. See Walker v. Prince George's Cnty., 575 F.3d 426, 429 (4th Cir. 2009) (O'Connor, J.) ("Here, we think it is plain that [the] constitutional right . . . is not clearly established. We thus decline to invest a substantial expenditure of scarce judicial resources by engaging in the essentially academic exercise of determining whether that right exists at all.").[1]

To make matters worse, the majority's unwarranted constitutional discussion in Part IV.B will deny UMBC any meaningful opportunity to seek or secure appellate review of the adverse constitutional violation ruling made by the majority. As the Supreme Court explained in Pearson, the "procedural tangle" created by the Saucier rule "ar[ises] from the Court's settled refusal to entertain an appeal by a party on an issue as to which he prevailed below, a practice that insulates from review adverse merits decisions that are locked inside favorable qualified immunity rulings." Pearson, 129 S. Ct. at 820 n.2. As Justice Alito explained for the unanimous Pearson Court, "the

---

[1] Cf. Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 169-70 (4th Cir. 2010) ("Because we believe this case will clarify and elaborate upon our prior jurisprudence in important and necessary ways, we will first address [plaintiffs'] constitutional rights . . . prior to addressing whether any such rights were clearly established at the time of the alleged wrongdoing.").

'prevailing' defendant [here, UMBC] faces an unenviable choice: comply with the lower court's advisory dictum without an opportunity to seek appellate or certiorari review, or defy the views of the lower court, adhere to practices that have been declared illegal, and thus invite new suits and potential punitive damages." Id. at 820 (emphasis added).

B.

The majority's Part IV.B assessment of the constitutional violation question is not only "advisory dictum," see Pearson, 129 S. Ct. at 820, but also (as previously noted) patently incorrect. Simply put, the relevant facts fail to show a constitutional violation, and I would therefore resolve this case on Saucier's first prong only. Unlike the majority's approach, such a resolution would not result in the "procedural tangle" created by Saucier, where the constitutional violation ruling is "insulate[d] from review" by the determination that the asserted constitutional right was not clearly established. See Pearson, 129 S. Ct. at 820 n.2.

Turning to the merits of the majority's ruling on the constitutional violation issue, the six words on which these plaintiffs rely are much too thin a supporting reed for their as-applied First Amendment challenge. Indeed, that challenge hinges on a single line in an electronic Google Desktop notice, reminding Mr. Tkacik, UMBC's in-house counsel, of a meeting

40

scheduled with Mr. Vernet, the student president of Rock for Life, on April 27, 2007. That line contains only these six words: "re: controversial exhibit; Rock for Life." J.A. 1622. I reject the view that these words provide sufficient support for a First Amendment violation.

As the district court correctly recognized, "reference to the exhibit as controversial arose from Plaintiffs' letter alerting Defendants to the controversial nature of the display and the need for security." Rock for Life-UMBC v. Hrabowski, 643 F. Supp. 2d 729, 746 (D. Md. 2009). The letter to which Judge Motz referred was first delivered by the plaintiffs to the UMBC police department on April 19, 2007, and was faxed to Mr. Tkacik in advance of the April 27 meeting.[2] The plaintiffs' letter asserted that, "because [the Center for Bio-Ethical Reform, one of Rock for Life's 'supporting organizations'] suffered numerous unprovoked physical attacks from pro-abortion students on the first few campuses it visited, [it] now transport[s] and employ[s] [its] own crowd-control barricades."

---

[2] In this regard, the majority recognizes only that the letter was given to Mr. Tkacik at the April 27, 2007 meeting. See ante at 6. There is, however, more to the story. Although Tkacik may have been provided with an additional copy of the letter at the April 27 meeting, the record reflects that he received the letter beforehand. Specifically, the letter was provided to the UMBC police department on April 19, see J.A. 821, 1148, and it was faxed to Tkacik by the police department on either April 24 or April 26, see id. at 1454, 1457.

41

J.A. 821. Put simply, I wholeheartedly agree with Judge Motz that the "Defendants should not be faulted for taking seriously the concerns raised by Plaintiffs." Rock for Life-UMBC, 643 F. Supp. 2d at 746-47.

By dismissing as irrelevant the fact that it was the plaintiffs who first raised the security issue, the majority has also created something akin to a "reverse heckler's veto." Under the Part V ruling, an educational institution has no choice but to address a student group's security concerns.[3] But in addressing those concerns, under the Part IV.B ruling the institution risks being seen as engaging in a content-based speech restriction — inevitably creating a jury question when the institution asserts an alternative content-neutral reason for its conduct. The educational institution is thereby faced with a Hobson's choice: (1) violate the First Amendment by not addressing a student group's security concerns; or (2) lose any chance of prevailing on summary judgment by addressing such concerns. By preventing an educational institution from prevailing on summary judgment, the majority's rule tramples on

_____

[3] Pursuant to Part V of the majority opinion, an educational institution in this Circuit is now "required by the First Amendment to address th[e] additional safety concerns by providing a security presence . . . or watching the event closely to determine whether security [is] truly necessary." Ante at 34.

42

the settled principle that the issue of qualified immunity should be resolved "at the earliest possible stage of litigation." Pearson, 129 S. Ct. at 815. This result also inappropriately impinges on an educational institution's manifest interest in the security of its students. See Healy v. James, 408 U.S. 169, 184 (1972) ("[A] college has a legitimate interest in preventing disruption on the campus.").

## II.

Consistent with the foregoing, I agree with the majority that we should award qualified immunity to the defendants on the as-applied First Amendment challenge to UMBC's policy on facilities use, but I would get there by a different route — namely, by concluding that a First Amendment violation has not been shown. Because there was no constitutional violation, I would rely solely on Saucier's first prong and award qualified immunity to the defendants on that basis.